Gerald L. HERZFELD, Plaintiff,

v.

LAVENTHOL, KREKSTEIN, HORWATH
& HORWATH, Defendant.

LAVENTHOL, KREKSTEIN, HORWATH
& HORWATH, Third-Party Plaintiff,

v.

The FIRESTONE GROUP, LTD., et al.,
Third-Party Defendants.

ALLEN & COMPANY and Allen & Company Incorporated, Third-Party
Counterclaimants,

v.

LAVENTHOL, KREKSTEIN, HORWATH
& HORWATH, Third-Party Counterclaim Respondent.

No. 71 Civ. 2209 (LFM).

United States District Court,
S. D. New York.

May 29, 1974.

Blum, Haimoff, Gersen, Lipson & Szabad, New York City, for plaintiffs; Louis Haimoff, New York City, of counsel.

Willkie Farr & Gallagher, New York City, for defendant and third-party plaintiff Laventhol, Krekstein, Horwath & Horwath; Louis A. Craco, Jack David and Patricia Anne Williams, New York City, of counsel.

Pollack & Singer, New York City, for third-party defendants and third-party counterclaimants Allen & Company and Allen & Company Incorporated; Daniel A. Pollack and Martin I. Kaminsky, New York City, of counsel.

MacMAHON, District Judge.

This action was tried to the court, without a jury, on eleven trial days, commencing October 15, 1973 and ending October 29, 1973. Plaintiffs Gerald L. Herzfeld and General Investors Co., a partnership,[1] invoking federal question and pendent jurisdiction,[2] sue the public accounting firm of Laventhol, Krekstein, Horwath & Horwath ("Laventhol") under the anti-fraud provisions of § 10(b) of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b); SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; New York General Business Law § 352–c (McKinney's Consol.Laws, c. 20, 1968); and the common law.

By leave of court, Laventhol has impleaded third-party defendants Irwin H. Kramer and Allen & Company Incorporated, claiming these defendants should indemnify it for any liability to plaintiffs.[3] Allen & Company and Allen & Company Incorporated (collectively "Allen") counterclaim against Laventhol seeking damages under § 10(b) of the Act, Rule 10b–5, § 352–c of the New York General Business Law, and the common law.

This action arises out of a private placement of $7.5 million of securities on December 16, 1969 by The Firestone Group, Ltd. ("FGL"), a Delaware corporation engaged in real estate syndication with its principal place of business in California. The securities in question were sold in units consisting of a $250,000 note and 5,000 shares of FGL common stock, at a price of $255,000 each. FGL hired Allen, an investment banking firm, to assist with the private placement and retained Laventhol to perform an audit of FGL's financial statements and to prepare and issue a report and audited financial statements for the eleven-month period ending November 30, 1969. Laventhol knew that its report and audited financial statements would be relied upon by Allen and by prospective investors.

In 1971, FGL petitioned for reorganization under Chapter XI of the federal bankruptcy law. During the bankruptcy proceedings, the $250,000 notes contained in each unit were converted into 25,000 shares of FGL preferred stock, and the 5,000 shares of common stock were reversed split 10 for 1, becoming 500 shares of new common stock. The value of the units, as of October 1, 1971, was estimated at trial to be $27,750 each.

Plaintiffs and Allen contend that the report and financial statements, prepared and issued by Laventhol on December 6, 1969, were materially misleading and that their reliance on the report led to the damages they subsequently suffered.

---

1. By leave of court, General Investors Co. was added as a party plaintiff during trial. Originally, this action was brought against various parties, including Allen. On November 11, 1971, plaintiff settled his claims with all defendants, except Laventhol. An amended complaint was then filed, naming Laventhol as sole defendant.

2. 15 U.S.C. § 78aa.

3. The third-party complaint names as third-party defendants Firestone Group, Ltd., Allen & Company, Incorporated, Allen & Company, Charles Allen, Lee W. Meyer, Irwin H. Kramer, Richard Firestone, Martin Scott and David Baird. Firestone Group, Ltd., Firestone and Meyer were never served. Laventhol voluntarily discontinued the third-party action against all defendants, except Irwin Kramer and Allen & Company, Incorporated.

Essentially, plaintiffs and Allen challenge the accounting treatment accorded by Laventhol to the purported purchase and sale by FGL of certain nursing home properties in November 1969. In the audited report, Laventhol treated these transactions as an acquisition and sale in which FGL first supposedly purchased the nursing homes from Monterey Nursing Inns, Inc. ("Monterey") for $13,362,500 on November 22, 1969 and then, four days later, sold them to Continental Recreation Company, Ltd. ("Continental") for $15,393,000 on November 26, 1969. Moreover, in the report's income statement, Laventhol treated as current income $235,000 and as deferred gross profit $1,795,000 of the projected profit from the transactions.

Plaintiffs and Allen contend that the accounting treatment accorded the Monterey-Continental transactions ("Monterey transactions") was incorrect and not, as Laventhol represented, "in conformity with generally accepted accounting principles" and that the financial statements did not "present fairly the financial position" of FGL as of November 30, 1969. Specifically, they claim that the Monterey transactions were "phony" and intended solely to give support to the private placement and that Laventhol knew or should have known they were "phony," or that the transactions involved nothing more than an option to buy the property at the buyers' discretion and that Laventhol knew or should have known them to be options.

The purchase and sale of the nursing homes was the largest single transaction in the history of FGL. The magnitude and importance of the Monterey transactions can be shown by a comparison of the financial condition of FGL, with and without the Monterey transactions, as in the table below:

| | Monterey Included | Monterey Excluded |
|---|---|---|
| Sales | $22,132,607 | $6,739,607 |
| Total Current Assets | 6,290,987 | 1,300,737 |
| Net Income | 66,000 | −169,000 (Loss) |
| Deferred Profit | 1,795,000 | None· |
| Earnings/Share | 10¢ | −25¢ (Loss) |

Thus, to the eye of a prospective investor, whether FGL appeared to be a profitable or unprofitable, a healthy or ailing, company depended on the recognition of the sales proceeds and the profit from the Monterey transactions in the company's financial statements. If the Monterey transactions were not included in the audited financial statements, it was likely that the private placement would not take place.

Mindful of the importance of the Monterey transactions and their treatment in the Laventhol report, we turn to a consideration of the auditing steps taken by Laventhol with regard to these transactions.

### THE AUDIT

Richard Firestone, president of FGL, called Arnold Lipkin, a Laventhol partner, in mid-November 1969 and told him that an audit of the financial statements of FGL, as of November 30, 1969, would be necessary. Laventhol then proceeded with the audit under the direction of Lipkin, as partner in charge, and Morris Schwalb, as manager of the audit. Schwalb discussed the audit with Chester Wadley, controller of FGL, on November 17, and thereafter Schwalb met with Lipkin periodically to discuss the mechanics of the audit.

A few days after November 26, when the FGL contract with Continental was reputedly signed, the existence of the FGL-Monterey and FGL-Continental contracts came to Schwalb's attention. In early December, Schwalb sought Lipkin's advice as to the proper way to report the transactions. Lipkin requested copies of the contracts and, after reading them, met with a Laventhol partner named Leonard, an expert in the hospital field, to discuss the reasonableness of the consideration in the contracts.[4]

Schwalb and Jerome Gottlieb, a Laventhol partner, met with Martin Scott, vice-president and director of FGL, in late November or early December. Scott informed them that Richard Firestone had initiated both agreements and that

---

4. Lipkin did not testify to the substance of this conversation.

Scott was dealing with a Mr. Abramowitz, president of Monterey, in order to assemble the documentation necessary to fulfill the contract terms.

Lipkin met with Firestone on December 2 and asked him about the details of the Monterey transactions. Firestone told Lipkin that the agreements were legitimate, arms-length contracts, made in the normal course of FGL's business. Firestone also provided Lipkin with a memorandum containing references respecting Max Ruderian, president and controlling stockholder of Continental. The memorandum stated that Ruderian had been engaged in real estate syndication for fifteen years and was:

"[T]he dean of the syndicators and has tutored almost all of the large syndication firms now operating. . . . We've know [sic] him for the last four years or so. He is very well know [sic] in Southern California and enjoys probably the top reputation in the field. His operations run into multi-millions of dollars annually."

The memorandum calculated Continental's net worth as "over $100,000," consisting of minature golf courses and other assets. Ruderian's business practice was to "buy and resell prior to final payment on his sales contracts." Firestone concluded:

"Arnold, this man and his companies are very valued contacts . . . . . . so if you speak to him please handle him with kid gloves we don't want to lose him for future transactions."

Lipkin, an attorney and a member of the bar of Illinois (he had only practiced law for one year, in 1955), examined the Monterey contracts to determine the proper accounting treatment and concluded that they were legally enforceable. The Monterey-FGL agreement provided for payment of $5,000 on execution of the contract, $25,000 on December 20, 1969, and $3,970,000 on or before January 30, 1970. The amount of $5,822,283.09 was payable "in favor of various institutional lenders," and $3,540,216.91 was payable in equal

monthly installments, at 9¼% interest, over twenty-five years. The contract also stated, in Exhibit B:

"Buyer reserves the right at any time after 1/30/70 or upon payment of the $3,970,000 cash down payment as required herein to convert this contract of sale to a conventional sale at which time Title shall pass to Buyer, subject to the existing mortgages of record and the balance of this contractual obligation shall be converted to a mortgage and note. Seller shall execute his grant deed in favor of buyer and buyer shall execute his note and mortgage in favor of seller."

The FGL-Continental contract contains identical language to that just quoted, with the substitution of the figure $4,965,250 for $3,970,000. That agreement provided for cash payments of $25,000 on execution of the agreement, $25,000 on or before January 2, 1970, and $4,965,250 on or before January 30, 1970. The amount of $9,363,500 was to be paid "in favor of various lenders," and $1,015,250 was payable in equal monthly installments, at 8½% interest, over ten years. The Continental agreement also provided that:

"Buyer shall pay to Seller in addition to those amounts already paid the sum of $185,000. in the event of failure to comply. Said additional $185,000. shall be liquidated damages."

After studying the contracts, Lipkin consulted Eli Boyer, a Laventhol partner, about Ruderian. Boyer knew Ruderian through various charitable endeavors as a man of substance and means and was familiar with Ruderian's reputation as a leading land syndicator. Boyer knew of one occasion in 1969 when Ruderian and his partner, Albert Spiegel, gave $50,000 in land and trust deeds to charity. Boyer told Lipkin all that he knew about Ruderian and early in December telephoned Ruderian, in Lipkin's presence, and spoke to him over a speaker phone about the Monterey transactions. Ruderian told Boyer that:

"I [Boyer] should have no concern about their interest in this deal, their

ability to complete it and the financial backing they had with respect to its final conclusion."

Ruderian also told Boyer that he had executed the FGL-Continental contract, regarded it as binding on Continental, and intended to comply with its terms.

After the telephone call to Ruderian, Lipkin called three bankers given as references for Ruderian in Firestone's memorandum and discussed Ruderian's reputation and credit with them. Each replied that Ruderian was "a very legitimate, outstanding, substantial business person."

Lipkin then discussed the proper accounting treatment to be accorded the Monterey transactions with Charles Chazen, Laventhol's national partner for auditing and accounting.[5] In the course of several conversations, Chazen told Lipkin that the proper way to reflect the transactions in the financial statements was to take into current income the two $25,000 cash payments and the $185,000 in liquidated damages payable under the Continental contract. Chazen also instructed Lipkin that Laventhol could not give a "clean" or "unqualified" opinion because the down payments were too small to give the buyer more than a thin equity in the property and the buyer had no recourse against the seller because a purchase money mortgage was involved. As Chazen testified, "conservative accounting dictated a qualification with respect to the collectability of the receivable resulting from the transaction."

Due to the magnitude of the transactions, Chazen felt it wise to verify the accounting treatment and the enforceability of the contracts with someone more experienced in real estate matters. Chazen, therefore, consulted a Laventhol partner named Zeman, who suggested that an attorney be called. With Lipkin and Zeman present, Chazen telephoned Julius Borah, a Los Angeles attorney.

In a short conversation, Chazen told Borah that the contract provided for the sale of interests in land and described selected parts of the contracts to Borah, such as, the amounts involved and the fact that the agreement provided for a non-recourse note and the liquidated damage clause in the Continental contract. Chazen then asked Borah if the contract were legally enforceable, "within its terms." Borah replied that the contract was valid. Borah did not ask to see the documents, nor were the contracts read or shown to him, despite the fact that his office was only a half-hour's drive away from Laventhol's office. Chazen did not inquire of Borah whether title to the properties had passed to FGL "because I knew title hadn't passed."

Lipkin testified that the conversation with Borah confirmed his opinion that the contracts were valid and enforceable.

On December 4, Chazen and Lipkin met with Firestone, Scott and Alan Scharf, Firestone's investment advisor, at Firestone's office. The Laventhol partners told Firestone that only a portion of the $2,030,000 profit from the Monterey transactions would be reported as current income for the period ending November 30. Firestone disagreed strongly, arguing that the entire profit should be recorded as current income. Scharf agreed with Firestone and threatened Laventhol with a lawsuit if the private placement fell through. The Laventhol people remained adamant, however, and refused to alter their treatment of the profit on the Monterey transactions.

Thus, when the report was issued on December 6, the Monterey transactions were recorded as a purchase from Monterey and a sale to Continental, the profit being divided into $1,795,000 of deferred income and $235,000 of current income.

5. Chazen testified that the national partner for accounting and auditing "is responsible for developing the firm's auditing standards, interpreting accounting principles as they are pronounced by the various bodies, acting in an advisory capacity, providing authoritative source for information which may be required during the course engagements, developing the firm's accounting and auditing manuals, and generally being the last word in accounting and auditing."

At some time during the audit, Schwalb discovered that the Monterey transactions were not recorded on the books of FGL. It was, therefore, decided that an adjusting entry was necessary and such an entry was prepared. Schwalb instructed Wadley to make the adjusting entry on FGL's books by letter on December 19, 1969.

Laventhol also decided to issue the report as a "qualified" opinion. Thus, on December 7 or 8, Schwalb called Wadley and told him to return all copies of the report to Laventhol immediately, saying, "there will be hell to pay if we don't get them back, and don't send them by mail, send them by messenger." Wadley returned the copies of the report and Laventhol substituted a new report which stated that it fairly reflected FGL's financial condition "subject to the collectibility of the balance receivable on the contract of sale (see Note 4 of Notes to Financial Statements)." This addition was the only change in the report, and it was this "qualified" opinion which was seen by the investors, including Herzfeld.

Chazen explained the meaning of the qualification:

> "What the qualification means is that it was the auditor's concern that because of the circumstances surrounding the transaction, including the amounts required to be paid initially and the fact that it was a non-recourse note and the fact that it was a purchase money mortgage, that all of these considerations led the auditors to believe that they were in no position to give an opinion on the financial statements, including this receivable because of the possibility of its failure to be collected."

The qualification, however, was not intended by Laventhol to cast doubt on the transaction as a bona fide sale.

Neither the purchase from Monterey nor the sale to Continental was ever consummated. FGL never received the second $25,000 down payment or the liqui- dated damages, or any other additional sum of money from Continental on this transaction.

### PLAINTIFFS' 10b–5 CLAIM

The essential facts which plaintiffs must prove here in order to establish a civil claim for relief under § 10(b) of the Act and Rule 10b–5 are that (1) Laventhol's report was materially misleading, (2) Laventhol knew that the report was misleading (scienter), (3) plaintiffs relied upon the report, and (4) plaintiffs suffered damages as a result of such reliance.[6]

### 1. WAS THE LAVENTHOL REPORT MATERIALLY MISLEADING?

We must first determine whether the audited report and financial statement issued by Laventhol was misleading in a material way. As we have discussed previously, the answer to this question turns on whether the Monterey transactions were properly reported by Laventhol.

Much has been said by the parties about generally accepted accounting principles and the proper way for an accountant to report real estate transactions. We think this misses the point. Our inquiry is properly focused not on whether Laventhol's report satisfies esoteric accounting norms, comprehensible only to the initiate, but whether the report fairly presents the true financial position of Firestone, as of November 30, 1969, to the untutored eye of an ordinary investor.

A major congressional policy underlying the anti-fraud provisions of the securities laws is the protection of investors who rely on the accuracy and completeness of information made available to them in connection with the purchase or sale of securities. Accordingly, those having greater access to information about which the investor is presumably uninformed, or those having a special relationship to investors, have an af-

6. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

firmative duty of disclosure.[7] A knowing failure to discharge this obligation will justify an award of damages under Rule 10b–5.[8]

■ There can be no doubt that Laventhol knew that its audited report was required for the FGL private placement and that investors would be relying on the financial statements. Thus, Laventhol had a special duty to issue a truthful report, because it had access to information concerning FGL which was not available to investors and because it knew investors were depending on Laventhol, as a public accounting firm, to reveal the truth about FGL's financial condition.

Traditionally, the accounting profession and the courts have recognized that an auditor or public accountant owes a duty to the public to be independent of his client and to report fairly on the facts before him. Thus, the SEC has said: "[t]he public accountant must report fairly on the facts as he finds them whether favorable or unfavorable to his client. His duty is to safeguard the public interest, not that of his client."[9]

■ The full disclosure by insiders, which is mandated by the securities laws, coincides with and reinforces the accountant's professional duty to investors who read his reports. This duty cannot be fulfilled merely by following generally accepted accounting principles. Thus:

"Compliance with generally accepted accounting principles is not necessarily sufficient for an accountant to discharge his public obligation. Fair presentation is the touchstone for de-

termining the adequacy of disclosure in financial statements. While adherence to generally accepted accounting principles is a tool to help achieve that end, it is not necessarily a guarantee of fairness."[10]

Indeed, compliance with generally accepted accounting principles will not insulate an accountant from criminal culpability for fraud.[11]

"[T]oo much attention to the question whether the financial statements formally complied with principles, practices and conventions accepted at the time should not be permitted to blind us to the basic question whether the financial statements performed the function of enlightenment, which is their only reason for existence." In re Associated Gas & Electric Co., 11 S.E.C. 975, 1058–59 (1942).

■ The policy underlying the securities laws of providing investors with all the facts needed to make intelligent investment decisions can only be accomplished if financial statements fully and fairly portray the actual financial condition of the company. In those cases where application of generally accepted accounting principles fulfills the duty of full and fair disclosure, the accountant need go no further. But if application of accounting principles alone will not adequately inform investors, accountants, as well as insiders, must take pains to lay bare all the facts needed by investors to interpret the financial statements accurately.

We now consider the parties' contentions in light of these guiding principles.

7. Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973).

8. See SEC v. Texas Gulf Sulphur Co., supra, 401 F.2d at 854–855.

9. Touche, Niven, Bailey & Smart, 37 S.E.C. 629, 670 (1957). See also, Rule 1.01, Code of Professional Ethics of the American Institute of Certified Public Accountants (1969); Drake v. Thor Power Tool Co., 282 F.Supp. 94, 104 (N.D.Ill.1967); T. Sonde, The Responsibility of Professionals under

the Federal Securities Laws—Some Observations, 68 Nw.U.L.Rev. 1, 3 (1973); Securities—Rule 10b–5—Accountant Held to Duty to Disclose Material Errors in Certified Financial Report Discovered Subsequent to Filing, 43 N.Y.U.L.Rev. 209, 211, 216 (1968).

10. T. Sonde, supra, 68 Nw.U.L.Rev. at 4.

11. United States v. Simon, 425 F.2d 796, 806–807 (2d Cir. 1969), cert. denied, 397 U. S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).

■ Plaintiffs and Allen first contend that the Monterey transactions were obviously "phony" and were concocted solely for the purpose of creating the false appearance that FGL was financially sound in order to induce investors to participate in the private placement. We think the evidence does not support the contention. Certainly, Laventhol's ascertainment of Ruderian's good reputation, coupled with his confirmation to Laventhol of Continental's bona fides in the transaction, indicated that the sale was not "phony." We think it quite unlikely that a man of Ruderian's good business reputation would lend his name to such a scheme. Moreover, we see no reason why Continental, with assets of only $100,000, would pay $25,000 to FGL merely to creat the appearance of a sale by FGL. Plaintiffs and Allen have simply failed to convince us that the Monterey transactions were "phony" much less that Laventhol knew it.

Plaintiffs claim also that the Monterey transactions were merely options and that Laventhol's failure so to characterize them was misleading. This argument rests on the language in both contracts referring to conversion of "this contract of sale to a conventional sale," the small down payments made, and a document referred to at trial as the "Amerson Memorandum." This memorandum, dated November 21, 1969, was a memorandum to Firestone, prepared by Donna Amerson, Scott's assistant, and was found in the Laventhol audit work papers.[12] It states that "[w]e have entered into an agreement for the purchase of real property on a Contract of sale" and recites the purchase price as $10,000,000, with down payments of $5,000, $25,000 and $2,970,000. It continued:

> "We have the option to convert the contract of sale to a conventional sale using a grant deed and trust deeds on

or after 1/30/70. In the event we exercise our option to convert, the contractual obligation of approximately $2,000,000 will be converted to a second trust deed."

The memorandum also stated that the property had been sold for $11,400,000, for a profit of 14% or $1,400,000, and that "[t]he buyer shall also have the option to convert the contract of sale to a conventional sale. . . ."

Plaintiffs also direct our attention to Exhibit B of the Monterey-FGL contract, which provides that a certain computation as to the balance payable on the contract should be made "at time option is exercised."

■ Plaintiffs argue that these documents are convincing proof that the Monterey transactions were merely options to buy the property and that Laventhol knew it. Obviously, the Amerson memorandum[13] should have alerted Laventhol to the possibility that these contracts might have been mere options. However, Laventhol examined the contracts themselves, which, despite the isolated appearance of the word "option" in Exhibit B to a three-page document labelled "Agreement for Sale of Real Estate," are ambiguous at best. We think the contracts, as a whole, are open to several interpretations, and the interpretation adopted by Laventhol was supportable. Boyer's conversation with Ruderian shows clearly that the president of Continental did not believe the contracts were options. Nor is there any evidence that Monterey or FGL regarded them a such. In short, plaintiffs have failed to show that the Monterey transactions were options or should have been reported by Laventhol as options.

■ Plaintiffs and Allen also contend that the report was misleading in a number of other material respects. The securities laws require full disclosure to investors of all material facts known to

---

12. This memorandum was admitted solely as a document brought to the attention of Laventhol. We do not consider it, therefore, as evidence of the truth of its contents. C.T.

McCormick, Law of Evidence § 228 at 464–65 (1954).

13. We may not, and do not, consider the memorandum for proof of its contents.

the insider. In this context, material facts are those which a reasonable investor would deem important in making his decision to buy the FGL securities.[14] Materiality, therefore, depends on whether a reasonable man in plaintiffs' position "might well have acted otherwise than to purchase" if informed of the crucial facts.[15] We think the full and fair disclosure required by Rule 10b–5 was absent here and that, therefore, the Laventhol report was materially misleading.

First, admittedly, Laventhol itself had considerable doubt about the ability of FGL to collect the balance due on the Continental contract, or even the $4,965,250 payment due on January 30,

1970. A cursory glance at the FGL statements indicates that unless Continental made the January 30 payment FGL would be unable to make the $3,970,000 payment due to Monterey on January 30. Thus, it was incumbent on Laventhol to reveal to investors its reservations and doubts concerning consummation of the transaction and the facts upon which its reservations were based.

Laventhol claims that its qualification that the report was "subject to the collectibility of the balance receivable on the contract of sale," along with Note 4, constituted full disclosure of its reservations. We disagree.

Note 4 [16] merely states the financial terms of the Monterey-FGL and FGL-

14. SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849; List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Chris-Craft Indus., Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 362–363.

15. Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970).

16. Because of its importance, we reproduce Note 4 here in its entirety:

"4. The Firestone Group, Ltd. acquired by contract of sale a group of convalescent hospitals containing approximately 1,900 beds. The properties were leased back to the former owners. In November, 1969 the Company sold the properties by means of a contract of sale.

The terms of the contract by which The Firestone Group, Ltd. purchased the properties provide for the following:

| | |
|---|---:|
| Assumption of existing first trust deed liens | $ 5,822,283 |
| Note payable, secured by second trust deed, requiring monthly amortization of principal and interest at 9¼% for 25 years | 3,540,217 |
| Cash: | |
| Upon contract execution | 5,000 |
| On December 20, 1969 | 25,000 |
| On January 30, 1970 | 3,970,000 |
| | $ 13,362,500 |

The contract of sale provided for the following:

| | |
|---|---:|
| Assumption of existing trust deed liens | $ 9,362,500 |
| Cash: | |
| Upon contract execution | 25,000 |
| On January 2, 1970 | 25,000 |
| On January 30, 1970 | 4,965,250 |
| Note secured by trust deed in favor of The Firestone Group, Ltd. requiring monthly amortization based on twenty-five years with interest of 8½%; final payment due in 120th month | 1,015,250 |
| | $ 15,393,000 |

The sales agreement also provides for liquidated damages of $185,000 if the buyer fails to perform.

Of the total gross profit of $2,030,500, $235,000 is included in the consolidated income statement and the balance, $1,795,500 will be considered realized when the January 30, 1970 payment is received. The latter amount is included in deferred income in the consolidated balance sheet."

Continental contracts, including the liquidated damage clause in the latter, and recites the treatment of the profit from the transactions. We believe the note is misleading in several respects:

(1) Neither the company from whom FGL bought the properties, nor the company to whom the properties were sold, is mentioned in the note. Nor does the note mention the fact that Continental, the buyer, had a net worth of only $100,000. We think it cannot be gainsaid that a reasonable investor would regard the small net worth of Continental as an important fact in deciding whether or not to buy the FGL securities.

(2) The note says that FGL "acquired" the nursing homes. The ordinary meaning of the word "acquired" in this context, we think, can only be that FGL had acquired title to the nursing homes. This was not true. At no time did FGL ever acquire title to these properties.

(3) The note states that the deferred income of $1,795,000 "will be considered realized when the January 30, 1970 payment is received." This statement at least implies that the payment will be received on the due date. There is no suggestion of the possibility that Continental would not carry out the contract or that the $4,965,250 payment would not be made. Considering the real doubts Laventhol had that such a payment would be made, this statement is misleading.

(4) The note states that the properties were leased back to their former owners. Laventhol had no proof that the leasing back ever occurred, except for the statement of the parties' intention to do so in the Monterey-FGL contract, and therefore this statement is misleading.

Accordingly, since we find Note 4 itself misleading, we reject Laventhol's argument that the note accurately presents Laventhol's reservations about the transactions.

Laventhol argues that the qualification as to the collectibility of the balance receivable on the sale contract "disclosed that Laventhol thought there was a possibility that the Monterey transactions might not turn out as well as all of the parties to the transactions hoped and expected they would." [17] We agree that the qualification throws some doubt on whether the transaction would be culminated, but we think more was required of Laventhol as an independent auditor. Each investor was entitled to decide for himself, on the basis of the stark facts, whether the transaction had a realistic prospect of being completed. The information needed to make that judgment and known to Laventhol was not disclosed in the Laventhol report.

Moreover, the inclusion of the Monterey transactions in sales and income was misleading without a *full* disclosure by Laventhol of all the material facts about the transactions. We must remember that the investors were depending on Laventhol to tell them what was happening at FGL. And the report issued by Laventhol simply did not accurately report the financial condition of the company.

Thus, we believe that the full disclosure mandated by the Act required Laventhol to include in its report *at least* the following facts: (1) Continental's net worth; (2) the ambiguity of the language in the contracts which might have suggested to some that they were options; [18] (3) Ruderian, on whose reputation and representations Laventhol was depending, was not personally liable on the contracts; (4) Ruderian's practice of reselling property before he paid for it; (5) neither of the transactions was recorded in FGL's books of original entry or corporate

---

17. Laventhol post-trial brief at 24–25.

18. While we declined to find that the contracts were options, a reasonable investor

might have considered the ambiguity of the language in the contracts important.

minute books; (6) this transaction was the largest in which FGL had ever participated; (7) FGL would show a loss if the income from the Monterey transactions were not realized; (8) FGL had not acquired title to the nursing home properties from Monterey; (9) no deed, title search or title insurance on the properties had ever been obtained by FGL; and (10) the legal opinion sought by Laventhol, on which it relied in treating the transaction as an enforceable purchase and sale, had been obtained over the telephone from an attorney who not only never saw the contract but never even had it read to him on the telephone.

We find that the Laventhol report was also misleading because it failed to disclose these facts yet reported the Monterey transaction as a sale and included the profit from the transaction in the income statement.

Moreover, the report was *materially* misleading. Thus, the facts which Laventhol failed to disclose or disclosed in a misleading way were "facts which affect the probable future of the company and . . . which may affect the desire of investors to buy, sell, or hold the company's securities." [19] We also think the facts were material under the test of Chasins v. Smith, Barney & Co., 438 F. 2d 1167 (2d Cir. 1970), in that disclosure of the true facts would have caused a reasonable man in Herzfeld's position not to buy the FGL securities.[20]

## 2. SCIENTER

The recent decision of the Court of Appeals, in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir. 1973) (en banc), has dispelled any doubt in this circuit that proof of scienter is an essential element of a civil claim under 10b–5. "[N]o violation of Rule 10b–5 occurs 'in the absence of [proof] amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme, or artifice to defraud. . . .'" Thus, plaintiffs must prove that Laventhol "had actual knowledge of any misrepresentations and omissions" it made, or that Laventhol's "failure to discover the misrepresentations and omissions amounted to a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge." [21] And it has been said that "knowledge of the fact that the figures created a false picture is enough . . ." to constitute scienter.[22]

As we have shown, all the omitted facts which should have been re-

---

19. SEC v. Texas Gulf Sulphur Co., *supra*, 401 F.2d at 849. "In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* "The materiality test is concerned only with whether a prototype reasonable investor would have relied [citation omitted]. Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest." Chris-Craft Indus., Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 363.

20. Chasins v. Smith, Barney & Co., *supra* 438 F.2d at 1171.

21. Lanza v. Drexel & Co., 479 F.2d 1277, 1304–1306 (2d Cir. 1973) (en banc); Cohen v. Franchard Corp., 478 F.2d 115, 123 (2d Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106 (1973); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971).

This is not the rule in several other circuits, where scienter is not a necessary element of a 10b–5 claim. See, Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961); Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962); Stevens v. Vowell, 343 F.2d 374, 379–380 (10th Cir. 1965); Myzel v. Fields, 386 F.2d 718, 734–735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); City Nat'l Bank v. Vanderboom, 422 F.2d 221, 229–230 (8th Cir.), cert. denied, 399 U.S. 905, 90 S. Ct. 2196, 26 L.Ed.2d 560 (1970).

22. Republic Technology Fund, Inc. v. Lionel Corp., 483 F.2d 540, 551 (2d Cir. 1973).

vealed to the investors were discovered by Laventhol during the course of its audit. The evidence, thus, clearly demonstrates that Laventhol had actual knowledge of the omitted facts which render its report misleading.

Moreover, the qualification in the Laventhol report that the FGL financial statements were "subject to the collectibility of the balance receivable on the contract of sale" not only failed adequately to reveal Laventhol's admittedly grave doubts about the Monterey transactions to investors but is also indicative of the firm's knowledge that the report painted a misleading picture of the financial health of FGL. Certainly, Laventhol knew that the qualification alone, absent disclosure of the reasoning and facts which prompted it, would not alert potential investors to the uncertainties which Laventhol knew were lurking in the Monterey transactions.

Some of the Laventhol audit work papers furnish additional evidence òf scienter. One document (PX 23), labelled "The Firestone Group Ltd., Notes" and dated November 30, 1969, contains the following entries:

"Estimated loss 4 months ended 4/30/69 200,000
Estimated loss 7 months ended 11/30/69 572,108
Loss before sale to Continental Recreation 772,108
Profit on sale to Continental Recreation 2,030,000
Profit before income taxes 1,257,892"

This work paper shows Laventhol's awareness of the vital importance of the Continental sale to FGL's financial health, because the transaction meant the difference between FGL's showing a profit or a loss.

Another Laventhol work paper (A–12), labelled, "Reclassification Journal Entries," and dated November 30, contains this statement:

"Reverse entry for tax liability for sale to Continental Recreation as

LKH&H will not record as a sale since not enough deposit was given Firestone."

This document shows the depth of Laventhol's doubts about the transaction and convinces us that Laventhol knew that the recording of the transaction as a sale and inclusion of the profit in the income statement was misleading, unless all the material facts were disclosed to the investors.

We find, therefore, that Laventhol had actual knowledge of the misleading nature of its report.

### 3. RELIANCE

Plaintiffs correctly contend that proof of reliance is not required in a case involving nondisclosure.[23] We think, however, that this case is properly characterized as one of misrepresentation, where proof of reliance is necessary. Thus, we have found that the Laventhol report misrepresented the financial condition of the company. It is of no moment that the misrepresentation in part resulted from failure to disclose material facts. We think the case no different from an accountant's false report of a company's earnings, a clear case of misrepresentation, because, in either case, the accountant makes representations which he knows are untrue. Affiliated Ute Citizens of Utah v. United States, therefore, which was grounded on a mere nondisclosure unaccompanied by any representation whatever, is inapposite.

Whether we characterize the issue as one of "reliance" or "causation," plaintiffs must show a nexus between the misrepresentations in the Laventhol report and the damage they have sustained. Thus, they must prove that " 'the misrepresentation is a substantial

---

23. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741, reh. denied, 407 U.S. 916, 92 S.Ct. 2430, 32 L.Ed.2d 692, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972). See also

Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Cohen v. Franchard Corp., *supra*, 478 F.2d at 124; Chris-Craft Indus., Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 374–375.

factor in determining the course of conduct which results in [their] loss.' "[24]

Herzfeld first heard of the FGL private placement in November 1969 from his friend, David Baird, who was a business broker. Baird told Herzfeld that Charles Allen regarded the deal as a good one and thought FGL was a very profitable company. In addition, Baird said, Allen thought that, with the 7.5 million dollars to be raised in the private placement, the company's future earnings should be even better. Herzfeld was enthusiastic about the securities after talking with Baird, especially since Charles Allen regarded the investment as a good one. Herzfeld was also encouraged by the prospect that the 5,000 shares of FGL stock in each unit would be split two for one and that FGL would buy back 5,000 shares of stock from each unit, at $25.00 per share.

Herzfeld also discussed the FGL placement in mid-November 1969 with Irwin Kramer, Charles Allen's son-in-law and a partner in Allen. Kramer told him that Charles Allen thought the deal was "the hottest deal he had ever seen" and offered to sell Herzfeld one unit.

Later in the month, Herzfeld received the FGL "Note and Stock Purchase Agreement," covering one unit of securities. He read the entire document, paying particular attention to the income statement. The income statement indicated to him that FGL was a "very profitable company," with earnings of approximately $2.00 per share. Herzfeld calculated the value of FGL stock to be $20.00 per share. The purchase agreement was accompanied by a letter from FGL advising that audited financial statements were being prepared. After reading the agreement, Herzfeld signed it, and he and his brothers also signed an agreement with David Baird, authorizing Baird, as their agent, to purchase one unit of FGL securities.

On December 16, 1969, Herzfeld received the auditied Laventhol report, accompanied by a letter from FGL "explaining" the changes in the financial statements. The letter also advised Herzfeld that:

"If for any reason you find that the changes reflected in the audited financial statements are of a nature which would have resulted in a change of your investment decision, we will arrange to promptly refund to you your subscription payment against receipt of our Note and Stock."[25]

Herzfeld read the letter and the income statement in the Laventhol report, which was the only part of the report he read. He paid particular attention to the earnings indicated and was very impressed by the deferred gross profit of $1,795,000. The latter figure, he understood, meant "that this is a profit that the company had made and was going to pick up in a subsequent accounting period."

█ The evidence clearly shows that the Laventhol report was a substantial factor in Herzfeld's decision to buy the securities and his subsequent loss. It is true that his initial interest in the securities was generated by sources other than Laventhol and that he actually purchased both units before seeing the audited report. Nevertheless, FGL's offer to refund the buyer's subscription payment left open the possibility that Herzfeld would rescind the agreement if the report had indicated that the securities were not a good investment. The income statement, however, only reinforced Herzfeld's belief that FGL was a profitable company. A true statement of the financial condition of the company, we believe, would have shaken that belief and possibly caused Herzfeld to

24. List v. Fashion Park, Inc., *supra*, 340 F. 2d at 462; Globus v. Law Research Serv., Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); Siegel v. Realty Equities Corp. of N.Y., 54 F.R.D. 420, 424–425 (S.D.N.Y. 1972); Werfel v. Kramarsky, 61 F.R.D. 674, 681 (S.D.N.Y.1974).

25. Plaintiffs' Exhibit 6.

change his mind and demand a refund of his payment. The report's false picture of FGL's financial condition was, thus, a substantial, even crucial, factor in convincing Herzfeld that his investment decision to purchase the securities was right. We find, therefore, that plaintiffs have shown sufficient reliance on the Laventhol report.[26]

## 4. DAMAGES

■ Herzfeld and General Investors Co. purchased two units of FGL securities for $510,000 and recouped $357,000 when they settled their claims against Allen and the other original defendants. They seek to recover the $153,000 difference, plus 9½% interest on $510,000, for the period September 1, 1970[27] until November 11, 1971,[28] and interest of 9½% on $153,000 for the period from November 11, 1971 to the date of trial. Laventhol admits that plaintiffs are entitled to their out-of-pocket loss of $153,000, if it is liable, but objects to both awards of interest as contrary to the proper measure of damages under the Act.

We think that both parties have overstated plaintiffs' out-of-pocket loss. There was evidence at trial that each unit of FGL securities is now worth $27,750. Thus, plaintiffs' two units are worth $55,500, and their out-of-pocket damage is only $97,500.

The Herzfelds' interest claims amount, essentially, to the interest they expected to receive on the notes from FGL. Thus, the interest was part of the profit they expected to make from their investment.

The Act prohibits a damaged party from recovering "a total amount in excess of his actual damages on account of the act complained of."[29] Actual damage does not include loss of anticipated profits. Recovery is limited to plaintiffs' out-of-pocket loss.[30] Since plaintiffs' interest claims are really claims for lost profits, they may not recover them under 10b–5, and they are entitled only to actual damages of $97,500.[31]

## THE HERZFELDS' CLAIM UNDER THE NEW YORK GENERAL BUSINESS LAW

■ Plaintiffs also claim that Laventhol violated § 352–c of the New York General Business Law. Laventhol contends that § 352–c is a penal statute and does not authorize a private right of action based on its violation and that, in any event, it has not violated the statute. We reject the contention.

The statute makes it a misdemeanor to engage in fraud or misrepresentation "where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase . . . of any securities . . . ."[32] The purpose of the statute is to protect the public against fraud in the sale of securities.[33]

26. Laventhol contends that plaintiffs cannot be found to have relied on the report because they did not read Note 4 or any other part of the report, except the income statement. However, we have found that part of the report on which plaintiffs did rely misleading, and, as we previously found, neither Note 4 nor any other part of the report would have presented plaintiffs with a true picture of the company's financial state.

27. The date on which FGL ceased paying interest on the notes.

28. The date of Herzfeld's settlement with Allen and the other defendants.

29. 15 U.S.C. § 78bb(a).

30. Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965); Estate Counseling Serv., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, 303 F.2d 527, 533 (10th Cir. 1962); Schaefer v. First Nat'l Bank of Lincolnwood, 326 F.Supp. 1186, 1193 (N.D. Ill.1970), appeal dismissed, 465 F.2d 234 (7th Cir. 1972). A defrauded seller, however, might be able to recover the profits made by an insider in violation of 10b–5. Janigan v. Taylor, supra.

31. Our holding as to plaintiffs' interest claims does not bar their recovery of prejudgment interest on damages, an issue we do not now decide.

32. N.Y. General Business Law § 352–c, subd. 1(c) (McKinney 1968).

33. Herdegen v. Paine, Webber, Jackson & Curtis, 31 Misc.2d 104, 220 N.Y.S.2d 459 (Sup.Ct.1961).

In Barnes v. Peat, Marwick, Mitchell & Co., 69 Misc.2d 1068, 332 N.Y.S.2d 281 (Spec.Term 1972), the court denied a motion to dismiss a cause of action under § 352–c because a private right of action could be inferred from the statute. 69 Misc.2d 1072, 332 N.Y.S.2d 281. On appeal, the Appellate Division affirmed Special Term's decision on the motion to dismiss. 42 A.D.2d 15, 344 N.Y.S.2d 645 (1st Dep't 1973).[34] We think, considering the recent decision of the Appellate Division in *Barnes*, the cited federal cases, the purpose of the statute, and the policy of the New York courts to imply a civil cause of action from a criminal statute designed to protect the public,[35] that we must find that § 352–c authorizes a private right of action by a person injured by its violation.

■ The elements of a private cause of action under § 352–c are uncertain, since it appears no reported New York case has gone to trial. It is claimed, however, that neither reliance nor scienter need be shown to establish a violation of § 352–c. We think, nevertheless, that proof of reliance in the sense of causation must be shown, for otherwise a defendant could be held liable under § 352–c even to purchasers whose damage could not be traced to his wrongdoing.

■ As we have shown in our discussion on the claim under 10b–5, plaintiffs have demonstrated the requisite reliance or causation here. As to scienter, the statute makes it unlawful to make "[a]ny representation or statement which is false, where the person who made such representation or statement . . . knew the truth. . . ."[36] The evidence shows that the Laventhol report, taken as a whole falsely portrays the financial condition of FGL and that Laventhol knew the truth. We find, therefore, that Laventhol violated § 352–c and is liable to plaintiffs for their out-of-pocket damage, $97,500, caused by that violation.

■ Plaintiffs' claims for the specified 9½% interest must be denied. Damages for fraud under New York law are limited to the actual pecuniary loss sustained by plaintiff, and all elements of profit are excluded. Since the private right of action under § 352–c is essentially a fraud action,[37] the common law fraud damage rule is applicable.[38]

## PLAINTIFFS' COMMON LAW CLAIMS

Plaintiffs make a variety of claims under the common law, including claims for (1) breach of contract as third-party beneficiaries, (2) negligence, and (3) common law fraud or deceit.

### 1. THE CONTRACT CLAIM

The complaint alleges that plaintiffs are third-party beneficiaries of the contract under which FGL retained Laventhol to audit FGL's financial statements as of November 30, 1969, and that Laventhol breached that contract by negli-

---

34. We disagree totally with Laventhol's contention that the Appellate Division's decision left "in question the authority of the denial of the motion to dismiss" by the Special Term. The Appellate Division did modify the order of the Special Term to stay the action pending disposition of several related class actions in federal court, but this modification had no effect whatsoever on the disposition of the motion to dismiss, which was affirmed. 42 A.D.2d at 15–16, 344 N.Y.S.2d 645. Federal courts which have considered this issue have come to a similar conclusion. Lupardo v. INM Indus. Corp., 36 F.R.D. 438 (S.D.N.Y.1965); American Bank & Trust Co. v. Barad Shaff Sec. Corp., 335 F.Supp. 1276, 1283 (S.D.N.Y.1972). Cf. Briskin v. Glickman, 276 F.Supp. 600 (S.D.N.Y.1967).

35. Atkin v. Hill, Darlington & Grimm, 15 A.D.2d 362, 244 N.Y.S.2d 553 (1st Dep't 1962), aff'd, 12 N.Y.2d 940, 238 N.Y.S.2d 516, 188 N.E.2d 790 (1963).

36. N.Y. General Business Law § 352–c, subd. 1(c).

37. Herdegen v. Paine, Webber, Jackson & Curtis, *supra*.

38. Reno v. Bull, 226 N.Y. 546, 124 N.E. 144, reargument denied, 227 N.Y. 591, 125 N.E. 924 (1919); Hanlon v. MacFadden Publications, Inc., 302 N.Y. 502, 99 N.E.2d 546 (1951); 3 N.Y.Jr., Fraud and Deceit § 254 at 336–37.

gently preparing its report. No evidence directed to such a claim was presented at trial. Nor do plaintiffs even argue this claim in their brief. Nonetheless, we must deal with it.

A third-party beneficiary must prove that the contract clearly expresses an intention to benefit him before he can enforce the contract in his favor.[39] It is not enough that a third party is an incidental beneficiary of a contract. The parties must intend that the contract operate to benefit the third-party beneficiary.[40]

The evidence here is that any benefit accruing to plaintiffs from Laventhol's audit was incidental. FGL commissioned Laventhol to perform the audit solely because Allen refused to close the private placement without an audit. There is no evidence that the parties intended to benefit plaintiffs, and, therefore, they may not recover as third-party beneficiaries of the FGL-Laventhol contract.

## 2. FRAUD AND NEGLIGENCE

Plaintiffs also seek to recover damages from Laventhol under theories of common law negligence and fraud. The law of New York as to an accountant's liability to third parties for negligent conduct is unclear.[41] Moreover, we think this case is better viewed as one involving fraud or deceit than negligence, and that plaintiffs are entitled to recover under the rule of Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931).

In *Ultramares*, while refusing to find that the defendant accountant was liable for negligent conduct, the Court of Appeals (Cardozo, Chief Judge), said:

"The defendants owed to their employer a duty imposed by law to make their certificate without fraud, and a duty growing out of contract to make it with the care and caution proper to their calling. . . . To creditors and investors to whom the employer exhibited the certificate, the defendants owed a like duty to make it without fraud, since there was notice in the circumstances of its making that the employer did not intend to keep it to himself." 255 N.Y. at 179, 174 N.E. at 444.

Here, Laventhol had a duty to investors, including plaintiffs, not to act fraudulently, since the circumstances of the audit indicated that FGL would be showing the report to other persons. Indeed, Laventhol knew the report was being made exclusively for the private placement. Thus, Laventhol is liable to plaintiffs for any fraud in its report.

To recover for fraud, plaintiffs must prove that (1) Laventhol made a false representation of a material fact, (2) Laventhol knew it was false, (3) Laventhol made the representation with intent to deceive investors and to induce them to rely upon it, (4) plaintiffs did rely upon it, and (5) plaintiffs suffered damage as a result.[42] We have al-

39. Cerullo v. Aetna Cas. & Sur. Co., 41 A.D.2d 1, 4, 341 N.Y.S.2d 767, 770 (4th Dep't 1973).

40. Associated Flour Haulers & Warehousemen, Inc. v. Hoffman, 282 N.Y. 173, 26 N.E.2d 7 (1940); H. R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928); Hylte Bruks Aktiebolag v. Babcock & Wilcox Co., 399 F.2d 289, 292 (2d Cir. 1968); 10 N.Y.Jur., Contracts §§ 239, 240 at 160-62.

41. See, Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931); State St. Trust Co. v. Ernst, 278 N.Y. 104, 15 N.E.2d 416 (1938); Duro Sportswear, Inc. v. Cogen, 131 N.Y.S.2d 20 (Sup.Ct., Spec.Term 1954), aff'd, 285 A.D. 867, 137 N.Y.S.2d 829 (1st Dep't 1955); Rusch Factors, Inc. v. Levin, 284 F.Supp. 85 (D.R.I.1968).

42. Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214 (1969); Channel Master Corp. v. Aluminum Ltd. Sales, Inc., 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); Sabo v. Delman, 3 N.Y.2d 155, 159, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957); Prosser, Law of Torts § 100 at 700 (3d ed. 1964); 24 N.Y.Jur., Fraud and Deceit § 14 at 47-48.

ready found that Laventhol's report contained material misrepresentations. We must still determine whether plaintiffs have proved sufficient scienter [(2) and (3)] and reliance [(4)] to recover for fraud.

Although we have found that Laventhol knew its report contained misrepresentations, plaintiffs must still establish that the misrepresentations were made with an intent to deceive them and other investors. As we have seen, Laventhol knew that its report was misleading and knew that it would be delivered to and relied upon by investors. Given these facts, surely Laventhol believed that its report would mislead or convey a false impression and thus deceive investors. The requisite scienter was, therefore, shown. Ultramares Corp. v. Touche, *supra*, 255 N.Y. 187, 174 N.E. 441.[43]

Plaintiffs must also show that they justifiably relied upon the report and that reliance led to damage. The misrepresentation must have played a material and substantial part in leading plaintiffs to adopt their course of action.[44] The fraudulent misrepresentation need not, however, be the sole inducing cause for a plaintiff's conduct.[45] It is sufficient that the representation was a material inducing cause.[46]

The evidence at trial clearly established that Herzfeld's actions were at least partially induced by the Laventhol report. Thus, he relied upon it to reinforce his belief that FGL was a profitable company. Herzfeld's decision to buy the securities was undoubtedly affected by several other factors, especially his conversations with Baird and Kramer, but the Laventhol report convinced him, at a time when he could have rescinded the purchase, that the FGL securities were a wise investment. Thus, it cannot

be said that the Laventhol report was not a material inducing cause of Herzfeld's and his brothers' purchase of the securities.

Finally, plaintiffs must show that they suffered damage as a result of the fraud. Plaintiffs were, as the evidence shows, damaged in the amount of $97,500 as a result of their purchase of the FGL securities. Since recovery for fraud in New York is limited to plaintiff's actual pecuniary loss,[47] plaintiffs' damages are limited to their out-of-pocket injury and their interest claims must be denied.

Plaintiffs having satisfied the elements of a cause of action for deceit or common law fraud, we find Laventhol is liable to plaintiffs under the common law for $97,500.

### THIRD–PARTY CLAIM

Laventhol, in its third-party complaint, seeks indemnity or contribution from Allen and Irving H. Kramer for damages it owes to plaintiffs as a result of our decision in favor of the plaintiffs in the main action.

In support of its claim over, Laventhol contends that Allen and its officer Kramer "touted" the FGL units by exaggerating their true value. The only conduct by either Allen or Kramer arguably approaching "touting" occurred when, during a social dinner, Kramer told Herzfeld that although he had no first-hand knowledge of the offering, Charles Allen felt that it was one of the hottest deals he had ever seen. Before this dinner conversation occurred, however, and unbeknownst to Kramer, David Baird had so thoroughly convinced Herzfeld that the offering was all but irresistible that Herzfeld not only agreed to advance money for Baird's purchase of one unit, in return for 75% of any prof-

43. Prosser, *supra*, § 102 at 715.

44. Prosser, *supra*, § 108 at 714.

45. Dress Shirt Sales, Inc. v. Hotel Martinique Associates, 12 N.Y.2d 339, 343, 239 N.Y.S.2d 660, 190 N.E.2d 10 (1963).

46. State St. Trust Co. v. Ernst, *supra*, 278 N.Y. at 122, 15 N.E.2d 416.

47. Reno v. Bull, *supra*.

its, but also agreed to assume the entire risk of loss from the investment. We think, under the circumstances, that Kramer's "touting," if any, neither heightened Herzfeld's eagerness nor affected his decision to purchase an additional unit. Therefore, the third-party complaint must be dismissed as against Kramer.

Laventhol also contends that Allen misstated to investors the true import of the Laventhol report by knowingly obscuring "the fact that the Laventhol audited report did not confirm the unaudited statements which had been previously circulated to the investors." It is undisputed that the unaudited financial report, which had been distributed to investors on or about November 10, 1969, projected FGL income as $315,000 for the eleven-month period ended November 30, 1969, whereas the Laventhol audited report of December 6, 1969 showed FGL net income to be only $66,916 for virtually the same period.[48]

Laventhol's charge of misconduct by Allen is levelled at the dual role of Lee Meyer in the transaction. Meyer, one of three directors of FGL and a vice president of Allen, supervised the private placement for Allen. Although Meyer did not participate in the preparation of the unaudited financial statements, he admitted reading them and discussing them with Firestone, and he paid special attention to the "bottom line" or net income figure of $315,000. Meyer also received, read and discussed the audited Laventhol report and expressed dissatisfaction with the significantly lower net income figure reported there. Thus, there can be no doubt that Allen, through its officer Meyer, was aware of the major discrepancies between the net income figures in the audited and unaudited financial statements.

There is also evidence to the effect that Allen, through Meyer, participated in discussions leading to the preparation of a letter, dated December 16, 1969, which both minimized and obscured the differences between the audited and unaudited financial statements.

Feinberg, Allen's attorney at the time the letter was prepared, testified that Meyer was present on December 15, 1969, when Feinberg and others began to prepare a summary of discrepancies between the audited and unaudited financial statements. The following day, December 16, a list of discrepancies appeared in a letter sent to investors. We can conceive of no reason for discussing discrepancies and preparing such a list on December 15 other than to incorporate the list into the December 16 letter.

The letter, after describing the discrepancies between the conflicting financial statements, stated that "none of these changes have resulted or will result in an adverse change in the financial condition or the results of our operations." Obviously, the letter was intended to still investors' doubts about the private placement and convince them that the differences between the unaudited and audited financial statements were of no consequence.

Since the net income figure in the unaudited statements was nearly five times greater than the net income figure in the Laventhol audited report, the statement in the letter, if not blatantly false, was plainly misleading. Thus, we find that Allen, through Meyer, knowingly misled investors by minimizing the material discrepancies between the audited and unaudited statements.

Finally, Laventhol claims that Meyer, motivated by a $200,000 profit for Allen, unsuccessfully pressured Laventhol to accede to Firestone's demand that its report show a substantially greater net profit by including all the unrealized profit from the Monterey transaction in the current accounting period.

Meyer, in his role as one of three directors of FGL, was thoroughly familiar with FGL's operations, and, although he testified that he was not active in the

48. The Laventhol audited report includes income and retained earnings for a period five days longer than the eleven-month period shown in the unaudited financial statement.

day-to-day management of the company, he did attend board meetings, review financial statements and observe operations. There can be no question that he was familiar with the Monterey transaction and its importance in FGL's total financial picture. We think the facts support the inference that he knew whether the units were a sound investment.

There is conflicting testimony as to whether Meyer attempted to influence Laventhol's accounting treatment of the Monterey transaction. Chazen and Lipkin, on the one hand, are certain that they spoke with Meyer and others during a speaker telephone conference on December 11, 1969, and Chazen relies on his time sheet to confirm the conversation. Both recall that Meyer was adamant in his demand that all the income anticipated from the Monterey transaction be reported as current income. Feinberg, on the other hand, said that he was present in New York on December 15, 1969, when a speaker telephone conference was held among Meyer, Firestone, Scott, Scharff and himself in New York and Lipkin and another Laventhol partner in California. He testified that Meyer did not tell Laventhol how to treat the Monterey transaction but merely questioned the propriety of Laventhol's treatment of the anticipated income.

Feinberg did testify, however, that because of the discrepancies between the unaudited and audited financial statements, "I thought we had a real problem in completing the placement" and that Meyer appeared to be "very, very upset and shaken . . . by the results . . . shown in the financial statements."

Meyer also testified that he in no way attempted to influence Laventhol. He first said that he questioned Lipkin about the financial statement on December 15, 1969, when Lipkin personally delivered it to New York, After Meyer left the stand, Lipkin testified that his time sheet showed that he had not been in New York on December 15, 1969.

Moreover, he was positive that he had not been in New York on that date because he had not been there for thirty-five years, except to attend a hearing before the Attorney General of New York some time subsequent to December 15, 1969. Confronted with Lipkin's testimony and the time sheet, Meyer changed his story. He conceded that his only conversation with Lipkin was by telephone and explained that he was confused in his earlier testimony about meeting him in New York on December 15.

Richard Firestone testified that Meyer agreed with his position that all the anticipated income from the Monterey transaction should be shown in the current accounting period, but he was unsure whether Meyer ever tried to convince Laventhol to change its report in accordance with his position.

We find Meyer's demeanor, his monetary motive to color the offering, his agreement with Firestone's position on the report, his participation in the preparation of the minimizing letter, and his changed story about meeting with Lipkin in New York on December 15, 1969 cast considerable doubt on the reliability of his testimony and the accuracy of his recollection.

In light of Meyer's inside knowledge of FGL's operation and, particularly, the Monterey transaction, we conclude that he had knowledge of the misleading nature of the report yet failed to disclose material facts to correct its misleading character. Allen is chargeable with knowing participation with Laventhol in misrepresentation and fraudulent nondisclosure of material facts. As underwriter of the private placement, Allen, no less than Laventhol, had a duty to reveal all the material facts needed by investors to enable them to make an intelligent investment decision. Allen plainly failed to fulfill its duty of full and fair disclosure to investors. Worse, had Meyer succeeded in his efforts to inflate the reported income in the audited report, the report

would have become even more misleading than it was.

Even though we have resolved the material factual issues raised by the third-party claim in favor of Laventhol, we still must deny Laventhol a right to indemnity from Allen. The most that has been shown is that Allen was guilty of knowing participation in Laventhol's and Firestone's fraudulent misconduct, either as an aider and abettor,[49] a joint tortfeasor,[50] a co-conspirator, or other joint wrongdoer.[51] One who intentionally joins in the perpetration of a fraud is denied a right of indemnity from others participating in the wrong, whether the claim is predicated on violation of the securities laws or the common law.[52] The full disclosure policy of the securities laws would be thwarted if an accountant could avoid paying damages to a defrauded plaintiff simply by shifting the ultimate burden of loss for his wrongdoing to a jointly culpable underwriter through indemnity.

Laventhol's claim for contribution, however, rests on firmer ground. Contribution among joint wrongdoers is appropriate in a § 10(b) or Rule 10b–5 action.[53] The district court in *Globus*, quoting *de Haas*, held that:

> " '[T]hose sections of the [securities acts] which expressly provide for civil liability contain express provisions for contribution among intentional wrongdoers. . . . Since the specific liability provisions of the Act provide for contribution, it appears that contribution should be permitted when liability is implied under Section 10(b).' "[54]

The policy underlying the securities laws is not frustrated by permitting contribution. Rather, that policy is reinforced. Contribution, unlike indemnity, does not permit a wrongdoer to escape loss by shifting his entire responsibility for damages to another party. Instead, it apportions the loss among the joint wrongdoers so that the deterrent effect of the judgment will be felt by all culpable parties. To deny contribution would be to dilute the deterrent effect of the securities laws, since Allen, a participant in Laventhol's fraud, would escape responsibility for its wrongdoing.

In a similar case, State Mut. Life Assur. Co. of America v. Peat, Marwick, Mitchell & Co., 49 F.R.D. 202 (S.D.N.Y.1969), the court, relying on N.Y. CPLR § 1401 (McKinney 1963), denied contribution to a joint wrongdoer on procedural grounds, holding that contribution is not permitted "unless a joint judgment has been recovered against the joint tortfeasors and the one seeking contribution has paid more than his pro-rata share of the judgment."[55] We feel, however, that in these days of mounting litigation costs, not to mention ever-greater demands on judicial time, such insistence on circuitous procedural mechanisms is unwarranted and unnecessary. Rather, the underlying goals of the securities laws, fairness to the parties, and judicial economies dictate that all disputes arising out of the same transaction should be settled in one proceeding. This can easily be accomplished by bringing the third party into

49. Chris-Craft Indus., Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 370.

50. Melodee Lane Lingerie Co. v. American Dist. Tel. Co., 18 N.Y.2d 57, 271 N.Y.S.2d 937, 218 N.E.2d 661 (1966); Derby v. Prewitt, 12 N.Y.2d 100, 236 N.Y.S.2d 953, 187 N.E.2d 556 (1962).

51. See generally, Prosser, *supra*, § 44.

52. Globus v. Law Research Serv., Inc., *supra*, 418 F.2d at 1287–1289; de Haas v. Empire Petroleum Co., 286 F.Supp. 809 (D.Col. 1968); Kuehnert v. Texstar Corp., 412 F.2d

700 (5th Cir. 1969); 3 L. Loss, Securities Regulation 1831 (1961).

53. Globus, Inc. v. Law Research Serv., Inc., 318 F.Supp. 955 (S.D.N.Y.1970), aff'd on opinion below, 442 F.2d 1346 (2d Cir. 1971); de Haas v. Empire Petroleum Co., *supra*. See also 3 L. Loss, *supra*, at 1739–1740 n. 178.

54. Globus, Inc. v. Law Research Serv., Inc., *supra*, 318 F.Supp. at 958.

55. 49 F.R.D. at 212.

the prime action under Fed.R.Civ.P. 14 or, for that matter, CPLR § 1007.[56]

 Under Dole v. Dow Chem. Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), Laventhol may, as it has, implead Allen and seek to recover a portion of the damages it must pay to plaintiffs. "No joint judgment is required, and if one of the tortfeasors is sued, he has the right to implead the other and to charge the latter . . ." with his share of the judgment.[57] It follows, therefore, that Laventhol is entitled to recover contribution from Allen. We must now decide what portion of plaintiffs' damages are to be borne by Allen.

There are two alternatives available for calculating the amount of Allen's contribution to Laventhol. Laventhol's liability to plaintiffs can be shared pro rata with Allen, or allocated relative to the degree of fault of Allen and Laventhol. We feel that in a securities fraud case, such as this, the pro rata method is more appropriate.

" 'The only workable rule to apply . . . is the one of pro rata contribution. . . . On the whole, judged by administrative expediency, this is probably as simple and satisfactory a way to handle the matter as any. To resort to fault, compensation, or extent of participation would be even more confusing.' "[58]

Furthermore, if we were to apportion the liability of Laventhol and Allen on the basis of their participation in the fraud, we would reach the same result. Although Laventhol prepared and disseminated the misleading report, it was encouraged to do so by Allen, which was equally aware of its misleading nature. In fact, Allen unsuccessfully sought to have Laventhol make changes in the report, the effect of which would have been to render it even more misleading. There can be no doubt that Allen and Laventhol were equally culpable. They will thus be held equally responsible. Laventhol is entitled to pro rata contribution from Allen in the amount of one-half of $97,500.

## COUNTERCLAIM

Allen counterclaims against Laventhol claiming violations of § 10(b) of the Act, Rule 10b–5, § 352–c of the New York General Business Law, and the common law. Significantly, Allen does not counterclaim for indemnity or contribution. Rather, although Allen admittedly purchased no units at the initial offering on December 16, 1969, it now purports to stand in the shoes of original innocent purchasers of the units as assignee of their claims against Laventhol. Allegedly, the assignments were made when the purchasers settled their claims against Allen. Allen claims to be subrogated to its assignors' rights and, therefore, seeks to "recover from Laventhol any and all damages they [the assignors] sustained regardless of what Allen paid them."[59] Thus, although Allen paid each assignor only $100,000 for each $255,000 unit, it seeks to recover damages of $227,250 per unit, a clear profit to Allen of $127,250 per unit.[60]

Laventhol contends that Allen is precluded from recovering on its counterclaim because Allen stands *in pari delicto* with Laventhol. If Allen were permitted to recover on its assigned claims, Laventhol argues, underwriters would be

---

56. See Dole v. Dow Chem. Co., 30 N.Y.2d 143, 149, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972).

57. J. M. McLaughlin, Supplementary Practice Commentary to N.Y. CPLR § 1401 (McKinney 1972).

58. 3 L. Loss, *supra*, at 1738, quoting with approval Douglas and Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 178–181 (1933); Globus, Inc. v. Law Research

Serv., Inc., *supra*, 318 F.Supp. at 958. See also Kuehnert v. Texstar Corp., *supra*, 412 F.2d at 705 n. 7.

59. Allen brief, at 108.

60. Allen bought seven complete units of FGL securities and part of an eighth unit, consisting of 7,739 shares of FGL convertible preferred stock and 150 shares of FGL common stock; Allen paid its assignor $30,600 for the fraction of a unit.

encouraged to engage in wrongdoing similar to that practiced here by Allen. Laventhol's argument requires us to review the state of the law concerning the *in pari delicto* defense in securities fraud cases.

The term *"in pari delicto"* means "in equal fault,"[61] and the defense is usually allowed where "the plaintiff has knowingly participated as an equal in the illegal act which caused the loss."[62]

Allen and Laventhol, as we noted earlier, were equally culpable in issuing the misleading audited report. Each knew that the report falsely depicted FGL's financial condition but made no attempt to reveal that fact to investors. Allen, moreover, not only attempted to make the report more misleading, but participated in minimizing the discrepancies between the audited and unaudited reports. Allen and Laventhol are, therefore, *in pari delicto.*

Few courts have considered whether the *in pari delicto* defense should be allowed in a securities case where the parties are equal participants in a fraud. Three courts, however, have denied recovery to a plaintiff whose wrongdoing constituted active fraud.[63]

In Moscarelli v. Stamm, the court denied plaintiff's motion for partial summary judgment, noting that while plaintiff's mere participation in the violation did not bar his recovery *per se*, instigation or wilful participation by plaintiff in the violation might bar recovery.[64]

Similarly, in Serzysko v. Chase Manhattan Bank, the court found that plaintiff's recovery for violation of Regulation U was precluded because he had knowingly and intentionally procured or induced that violation by intentionally making false statements to the defendant.[65] The court reasoned that allowing plaintiff to recover "would be to encourage rather than discourage deception on the part of investor-borrowers with resulting prejudice to the observance of the margin requirements of the Act."[66]

In Kuehnert v. Texstar Corp., plaintiff, a tippee, sued an insider for violation of § 10(b) claiming that defendant had revealed false inside information to him, on which he traded and was damaged. The Court of Appeals for the Fifth Circuit held that the district court had properly refused to allow plaintiff, as a tippee, to assert defendant's violation of § 10(b), because to permit recovery would encourage tippees to trade on the inside information they acquire. The court noted, however, that application of the *in pari delicto* defense rested with the discretion of the court and that "[t]he question must be one of policy: which decision will have the better consequences in promoting the objective of the securities laws by increasing the protection to be afforded the investing public."[67]

Although our Court of Appeals has not considered the appropriateness of *in pari delicto* in a § 10(b) case, it has questioned the applicability of the defense in a suit for violation of the margin regulations.[68] However, the court

61. Black's Law Dictionary 898 (4th ed. 1957) ; Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 135, 88 S. Ct. 1981, 20 L.Ed.2d 982 (1968).

62. Comment, 54 Minn.L.Rev. 878, 879 (1970).

63. Kuehnert v. Texstar Corp., 286 F.Supp. 340 (S.D.Tex.1968), aff'd, 412 F.2d 700, *supra*; Serzysko v. Chase Manhattan Bank, 290 F.Supp. 74 (S.D.N.Y.1968), aff'd per curiam, 409 F.2d 1360 (2d Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) ; Moscarelli v. Stamm, 288 F. Supp. 453 (S.D.N.Y.1968).

64. 288 F.Supp. at 459–460.

65. 290 F.Supp. at 87.

66. *Id.* at 89–90.

67. 412 F.2d at 704. Courts in this district have split on whether *in pari delicto* will bar recovery by a tippee under § 10(b). See Nathanson v. Weis, Voisin, Cannon, Inc., 325 F.Supp. 50 (S.D.N.Y.1971) ; Wohl v. Blair & Co., 50 F.R.D. 89 (S.D.N.Y.1970).

68. Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970). As the Court of Appeals noted in *Pearlstein,* congress placed the responsibility for observing the margin

expressly refused to "follow" or "attack" the holdings of *Serzysko* or *Moscarelli* because "the kinds of contributory fault there involved go beyond knowledge of the margin requirements to concealment or misstatement of material facts.[69] Thus, Pearlstein v. Scudder & German leaves us free, as was the court in SEC v. Packer, Wilbur & Co., 362 F.Supp. 510, 514–515 (S.D.N.Y.1973), to apply the *in pari delicto* defense to cases involving "a wilful misstatement of material facts" by a claimant.[70]

We think the discretionary, policy-oriented approach adopted by the Fifth Circuit in *Kuehnert* is appropriate here and that the protection of investors envisaged by the securities laws can better be promoted by denying Allen recovery.

If the defense of *in pari delicto* is ever appropriate in a securities case, and we think it is, this is such a case. Allen was not a passive investor who merely borrowed money from a bank, or a broker, knowing that the margin regulations were thereby violated. Rather, Allen was an active participant in Laventhol's issuance of a misleading report and sought not only to profit from Laventhol's fraud but to compound it by providing investors with even less information than Laventhol. It would be absured and unconscionable to allow Allen to reap a huge profit by asserting the fraud claims of innocent investors when the fraud would never have occurred had Allen acted in accordance with its duty as an underwriter.

More importantly, however, allowing Allen recovery here would encourage, rather than discourage, fraud by underwriters involved in securities transactions because they could then profit from their fraud by settling with the victims for less than the value of their claims and assert those claims against other participants in the fraud. The better result, we think, is to deny Allen recovery on its assigned claims, thus ensuring that future underwriters will think twice before entering into a fradulent scheme. Such a result also provides the maximum deterrence against violation of the securities laws.

Therefore, since Allen is barred from asserting its assignors' claims, the counterclaim must be dismissed.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P.

Accordingly, the Clerk of the court is directed to enter judgment:

(1) in favor of plaintiffs against defendant Laventhol for damages in the amount of $97,500, with costs;

(2) in favor of third-party plaintiff Laventhol against third-party defendant Allen for damages in the amount of $48,750, with costs;

(3) in favor of third-party defendant Irving H. Kramer against third-party plaintiff Laventhol dismissing the

---

regulations on the broker, by forbidding him to extend undue credit, but did not forbid customers from accepting such credit. 429 F.2d at 1141. Thus, *in pari delicto* may be an inappropriate defense for a broker who has violated the margin regulations. Section 10(b), however, forbids the conduct practiced by both Allen and Laventhol here, and, therefore, the rationale adopted by the court in *Pearlstein* is not applicable to this case.

69. 429 F.2d at 1142. We note, as did Judge Friendly in his dissent in *Pearlstein*, 429 F. 2d at 1148, that *Serzysko* was affirmed by the Second Circuit "in all respects." 409 F.2d 1360. Moreover, we do not regard

Perma Life Mufflers, Inc. v. International Parts Corp., *supra*, to be pertinent since in that antitrust case plaintiff was coerced into participating in the defendant's violation of the statute. The court did not decide whether "truly complete involvement and participation in a monopolistic scheme could ever be a basis, wholly apart from the idea of *in pari delicto*, for barring a plaintiff's cause of action." 392 U.S. at 140.

70. 362 F.Supp. at 514. See also Avery v. Merrill Lynch, Pierce, Fenner & Smith, 328 F.Supp. 677, 680 (D.D.C.1971); Aubin v. H. Hentz & Co., 303 F.Supp. 1119, 1121 (S.D. Fla.1969).

third-party complaint as against Irving H. Kramer; and

(4) in favor of third-party plaintiff Laventhol against third-party defendant Allen dismissing Allen's counterclaim.

So ordered.