Edward E. ODETTE, Plaintiff,

v.

SHEARSON, HAMMILL & CO., INCOR-
PORATED, Defendant and Third-
Party Plaintiff,

v.

NATIONAL BANK OF NORTH AMER-
ICA, Third-Party Defendant.

Renee SLADE, Plaintiff,

v.

SHEARSON, HAMMILL & CO., INCOR-
PORATED, Defendant and Third-
Party Plaintiff,

v.

NATIONAL BANK OF NORTH AMER-
ICA, Third-Party Defendant.

COMPASS BANK AND TRUST COMPA-
NY, LIMITED and Northwestern Na-
tional Bank of Minneapolis, Plaintiffs,

v.

SHEARSON, HAMMILL & CO., INCOR-
PORATED, Defendant and Third-
Party Plaintiff,

v.

NATIONAL BANK OF NORTH AMER-
ICA, Third-Party Defendant.

Stephen E. FELDMAN, Plaintiff,

v.

SHEARSON, HAMMILL & CO., INCOR-
PORATED, Defendant and Third-
Party Plaintiff,

v.

NATIONAL BANK OF NORTH AMER-
ICA, Third-Party Defendant.

Nos. 72 Civ. 4930, 72 Civ. 4779, 73 Civ.
1461 and 74 Civ. 1800.

United States District Court,
S. D. New York.

March 24, 1975.

R. Alan Stotsenburg, New York City, for plaintiff Odette.

Mordecai Rosenfeld, New York City, for plaintiff Slade.

Cleary, Gottlieb, Steen & Hamilton by Edwin B. Mishkin, New York City, for plaintiffs Compass Bank & Trust Co., Ltd. and Northwestern National Bank of Minneapolis.

David B. S. Cohen, New York City, for plaintiff Feldman.

Dewey, Ballantine, Bushby, Palmer & Wood by Russel H. Beatie, Jr., New

York City, for defendant Shearson, Hammill & Co., Inc.

Olwine, Connelly, Chase, O'Donnell & Weyher by John Logan O'Donnell, New York City, for third-party defendant National Bank of North America.

OPINION

ROBERT L. CARTER, District Judge.

Defendant Shearson, Hammill & Co., Inc. (Shearson) has filed third-party complaints for indemnification against National Bank of North America (NBNA) in the three class actions [1] and the related individual action [2] in which Shearson is alleged to have violated the fraud provisions of the federal securities laws. Third-party defendant NBNA has moved pursuant to Rules 14(a) and 12(b), F.R.Civ.P., for an order dismissing the third-party complaints on grounds of improper venue and failure to state a claim on which relief can be granted. These motions are denied.

Shearson has also moved to consolidate the class action, Feldman v. Shearson, Hammill & Co., Inc., with the *Slade* and *Odette* actions which were previously consolidated. That motion is granted.

The principal complaints in all four actions allege that Shearson sold securities of Tidal Marine International Corp. (Tidal) and one of its shipping subsidiaries while in possession of material, adverse information about Tidal. In its third-party complaints, Shearson seeks indemnification from NBNA for any liability that may be imposed on it in these actions.

*Venue is Proper in the Southern District of New York*

Shearson's third-party complaints assert that venue is properly laid in this district under both Section 27 of the Securities Exchange Act of 1934, 15 U.S.C.

1. Slade v. Shearson, Hammill & Co., Inc., 72 Civ. 4779; Odette v. Shearson, Hammill & Co., Inc., 72 Civ. 4930; Feldman v. Shearson, Hammill & Co., Inc., 74 Civ. 1800.

2. Compass Bank and Trust Co., Ltd., et al. v. Shearson, Hammill & Co., Inc., 73 Civ. 1461.

§ 78aa, and the general federal question venue statute, 28 U.S.C. § 1391(b).

On this motion, however, NBNA contends that under the venue provision of the National Bank Act, 12 U.S.C. § 94, which it claims is controlling in this case, venue is proper only in the Eastern District of New York. The statutory provision in question provides that a federal court action may be brought against a national bank only in the federal district in which it is "established":

> "Actions and proceedings against any association under this chapter[3] may be had in any district or Territorial court of the United States held within the district in which such association may be established * * * ."

■■■■ It is settled that "a national bank is 'established,' within the meaning of Section 94 * * * *only* in the federal district encompassing the location *specified in its charter* [citations omitted]." General Electric Credit Corp. v. James Talcott, Inc., 271 F.Supp. 699, 703 (S.D.N.Y.1966) (Emphasis added). A bank does not become established in every district in which it has a branch bank. Leonardi v. Chase National Bank of City of New York, 81 F.2d 19, 22 (2d Cir.), cert. denied, 298 U.S. 677, 56 S.Ct. 941, 80 L.Ed. 1398 (1936).

NBNA's charter states that its "main office" is in Queens, thus showing that it is established in the Eastern District of New York. Therefore, NBNA argues, suit may be maintained against it only in that district.

■■■■ NBNA also contends, and the court agrees, that the broad venue provision of § 27 of the Exchange Act is not to be construed to supersede § 94. The Second Circuit so held in reaffirming "with regret"[4] the primacy of "the special and exceedingly narrow venue provisions" of § 94 which may, in some cases, render it inconvenient or impossible to compel national banks to account for their misdeeds in securities transactions, Bruns, Nordeman & Co. v. American National Bank & Trust Co., 394 F.2d 300, 301 (2d Cir.), cert. denied, 393 U.S. 855, 89 S.Ct. 97, 21 L.Ed.2d 125 (1968); Klein v. Bower, 421 F.2d 338, 342 (2d Cir. 1970); *contra,* Ronson Corporation v. Liquifin Aktiengesellschaft, 483 F.2d 852 (3d Cir. 1973).

Apparently acknowledging that § 94 would ordinarily be controlling, Shearson contends that NBNA has, nevertheless, waived the venue defense by prior acts inconsistent with its present effort to retreat across the East River.

■■■ Shearson first argues that NBNA has "generally" waived the statute by extensive commercial banking, branch banking and public advertising in the Southern District. In support of its argument, Shearson presents several NBNA and trade publications which show that NBNA's principal headquarters, some 76 per cent of its major divisions, and 27 full service branches are located in New York and Westchester counties.

However appealing Shearson's argument may be, there is no authority in this circuit to support its theory of a "general waiver" through full service banking. Moreover, in Helco, Inc. v. First National City Bank, 470 F.2d 883, 885 (3d Cir. 1972), the Third Circuit held that a New York City Bank did *not* waive the venue defense as to federal court actions brought in the Virgin Islands by establishing a single branch there.

It is true that the instant case may be distinguished from *Helco,* since here the asserted waiver is based on the operation of *many* branches at only a short

---

3. The phrase "under this chapter" modifies "association," not "actions and proceedings." Thus § 94 applies to *all* actions against national banks, not merely those brought under the National Bank Act. Leonardi v. Chase National Bank of City of New York, 81 F.2d 19, 21 (2d Cir.), cert. denied, 298 U.S. 677, 56 S.Ct. 941, 80 L.Ed. 1398 (1936).

4. The American Law Institute has urged repeal of § 94. *See* ALI, Study of the Division of Jurisdiction between State and Federal Courts (1969) at 412–13.

distance from the main office. Moreover, as in Reaves v. Bank of America, 352 F.Supp. 745 (S.D.Cal.1973), the policy of § 94 to avoid undue disruption of national bank operations would not be materially advanced by permitting NBNA to defend this action in the Eastern District, rather than the Southern District where so much of its business is conducted.

However, in the absence of more persuasive authority than Reaves v. Bank of America, *supra*, I hesitate to base a finding of waiver on NBNA's "full service" banking in the Southern District.

■ The second ground on which Shearson asserts that NBNA has waived the protection of § 94 is that it has failed to raise the venue defense in prior litigation. Shearson cites seven cases now pending before this court and three cases decided in the last six years by the New York State Supreme Court Appellate Division for the First Department in which NBNA appeared as a defendant but failed to raise the venue defense.[5]

However, neither this court nor the Court of Appeals has considered whether a party's failure to raise a venue defense in *prior* litigation may constitute a waiver.[6] This court has decided only the issue of whether failure to make a timely objection to venue during a *particular* litigation waived the defense *as to that litigation*. Altman v. Liberty Equities Corp., 322 F.Supp. 377, 379 (S.D.N.Y.1971); *see also* Exchange National Bank of Chicago v. Abramson, 45 F.R.D. 97, 105–106 (D.Minn.1968).

In the absence of some authority of this court or circuit, I am disinclined to hold that NBNA's conduct during prior litigation is dispositive of the venue issue.

■ Shearson's third argument is that a bank should be held to have waived venue "specifically" where its

banking activities in a particular district give rise to the cause of action *sub judice*. In the instant case, NBNA's commercial loan business, including the Ship Loan Department which allegedly committed the fraud, is located exclusively in the Southern District of New York.

Although I agree with the logic of Shearson's argument, there is again no authority beyond the *Reaves* case, *supra*, to support it. I am reluctant to rest decision on this slender reed—particularly since somewhat firmer authority is at hand which seems to call for the rejection of NBNA's venue defense.

■ Shearson fails to make what I regard as the strongest and most conclusive argument in support of its position. There is a line of authorities holding that if venue is properly laid in the principal action, a third-party defendant impleaded under Rule 14(a) may not successfully raise the defense that venue would be improper in an original action by the third-party plaintiff against the third-party defendant. As Professor Moore has written:

> "With a few exceptions, especially in the earlier decisions, the weight of authority supports the view herein advocated: the third-party defendant has no objection based on venue." 3 Moore's Federal Practice ¶ 14.28[2]. (footnotes omitted)

The courts have held that the reasoning which supports ancillary subject matter jurisdiction over a third-party claim also supports ancillary venue. McGonigle v. Penn-Central Transportation Co., 49 F.R.D. 58, 60 (D.Md.1969); 6 C. Wright and A. Miller, Federal Practice and Procedure § 1445. Specifically, the purpose of the Federal Rules is to "simplify and expedite procedure." Consistent with this, "[t]he purpose of Rule 14 was to accomplish in one proceeding the adjudication of the rights of

---

5. NBNA notes, however, that it has also asserted the defense at least eight times since 1971 in this and other districts.

6. Indeed the only authority supporting this proposition is Reaves v. Bank of America, *supra*, 352 F.Supp. at 749–50.

all persons concerned in the controversy * * *." United States v. Acord, 209 F.2d 709, 712 (10th Cir.), cert. denied, 347 U.S. 975, 74 S.Ct. 786, 98 L.Ed. 1115 (1954). As this court said in one of its earliest decisions considering this issue, "the spirit and purpose of Rule 14 to a great extent would be frustrated if the venue statutes had to be applied to third-party proceedings under the Rule." Morrell v. United Air Lines Transport Corp., 29 F.Supp. 757, 759 (S.D.N.Y. 1939).

■ Therefore this court in Thompson v. United Artists Theatre Circuit, Inc., 43 F.R.D. 197, 201 (S.D.N.Y.1967), a diversity action, recently reaffirmed that if venue is proper in the principal action, there need be no independent basis for venue in the third-party claim. The Second Circuit had earlier espoused this position in *dictum.* Agrashell, Inc. v. Bernard Sirotta Co., 344 F.2d 583, 585 (2d Cir. 1965). In addition, in United States v. Acord, *supra,* 209 F.2d at 713, where the United States as third-party defendant moved to dismiss under the venue provision of the Tort Claims Act, the Tenth Circuit adopted the rule that a third-party defendant could not raise the venue defense. *Acord* was recently followed in McGonigle v. Penn-Central Transportation Company, *supra,* 49 F.R.D. at 61, a federal question action under the Federal Employers' Liability Act.[7]

NBNA contends, however, that to deprive third-party defendants of the venue defense would be to extend the venue of the district court in violation of Rule 82, F.R.Civ.P.:

"These rules shall not be construed to extend or limit the jurisdiction of the United States district courts or the venue of actions therein. * * * "

This argument was answered long ago in a case decided by this court shortly after Rule 14(a) was adopted. In Morrell v. United Air Lines Transport Corp., *supra,* it was noted that before the adoption of Rule 14, third-party defendants could not prevail on a venue defense. *See, e. g.,* Dickey v. Turner, 49 F.2d 998, 999 (6th Cir. 1931). The court said that venue is not extended in violation of Rule 82 "if the law with respect to the venue of ancillary proceedings before the adoption of the new rules is applied to all ancillary proceedings which arise under the rules." 29 F.Supp. at 759.

NBNA also cites Swiss Israel Trade Bank v. E. L. Mobley, 319 F.Supp. 374, 375 (S.D.Ga.1970), in which the court dismissed a third-party complaint for improper venue, holding that § 94 was fully applicable in a third-party proceeding. This decision cites no authority for its principal holding, and its reasoning is not persuasive.[8] I decline to follow it.

■ Since NBNA is a third-party defendant pursuant to Rule 14(a), I hold that it may not object to venue in the Southern District of New York. The purpose of Rule 14(a), to avoid multiplicity of actions, will be served by requiring NBNA to contest Shearson's claims in this proceeding rather than in a separate suit a few miles away in the Eastern District.

---

7. In a similar context, the Second Circuit in Lesnik v. Public Industrials Corporation, 144 F.2d 968 (2d Cir. 1944), held that a defendant in a counterclaim, brought into the case under Rule 13(h), was precluded from raising the defense of improper venue if venue was proper in the principal action.

8. The court in Mobley acknowledges that a third-party claim may be ancillary for jurisdictional purposes; but with respect to venue, it states: " * * * the rulemaking authority must yield to the legislative powers." 319 F.Supp. at 375. Commentators, including the one cited by Mobley for the rule as to jurisdiction, have reasoned, however, that if a third-party claim is sufficiently ancillary to avoid the *constitutional* limitations on subject matter jurisdiction, it should be considered ancillary for purposes of *statutory* venue requirements. 3 Moore's Federal Practice ¶ 14.28[2]; 6 Wright and Miller, *supra,* § 1445.

*The Motion to Dismiss Under Rule 12(b)(6)*

NBNA also moves to dismiss the third-party complaints on two principal grounds: (1) NBNA first contends that the pertinent substantive law does not allow indemnification for the violations of the securities laws with which Shearson is charged in the principal actions. (2) NBNA also argues that the third-party complaints fail to state a claim under Rule 10b–5 because Shearson does not meet the purchaser-seller requirement and because it fails to allege an actionable wrong under the rule.

*Allegations of the Complaints in the Principal Actions*

The *Slade, Odette* and *Feldman* class action complaints allege in substance that Shearson in its capacity as investment banker to Tidal came into possession of material, adverse information about Tidal, but that in its capacity as broker and dealer, Shearson nevertheless sold Tidal stock to its customers, including members of the class. Shearson's acts are claimed to have violated Sections 10(b) and 15(c)(1), (2) and (3) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78o(c)(1), (2) and (3), and Rules 10b–5 and 15c1–2 promulgated thereunder.

The plaintiff banks in the *Compass* action maintain that they were fraudulently induced by Shearson, acting as Tidal's agent, to purchase notes of Tidal's wholly-owned subsidiary, Galaxy Steamship Company, together with warrants for 10,000 shares of Tidal stock. It is alleged that Shearson understated Tidal's long-term debt, overstated its net working capital and the size of its fleet, and generally represented that Tidal was a prosperous time-charter ship company, whereas, in fact, it was operating near insolvency in the speculative spot-charter market. It is charged that these misrepresentations constituted violations of Sections 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77l(2), 77q(a), Sections 10(b) and 15(c) of the Exchange Act, and common law fraud.

*Allegations of Third-Party Complaints*

In its third-party complaints, Shearson claims that NBNA is responsible for any misrepresentations Shearson may have made to its customers. The complaints seek "indemnification" from NBNA for any liability to the plaintiff which Shearson may incur in the principal actions.

In paragraph 14 of its third-party complaints, Shearson alleges that NBNA "conspired with" and "aided and abetted" officers of Tidal in giving false information to Shearson. It was allegedly on the strength of these representations that Shearson recommended Tidal securities to its customers. Most of the allegations concern claimed misrepresentations by *Tidal* to Shearson. However, it is also alleged that officers of *NBNA*, in exchange for bribes, made long-term loans to Tidal in excess of the legal lending limit, some of which were secured by non-existent ship charters. Officers of Tidal allegedly understated to Shearson the amount of its secured debt owed to NBNA with knowledge that Shearson would rely on the misrepresentations in making investment recommendations as to Tidal securities.

In addition, Shearson alleges that NBNA falsified its books to show that certain of the loans had been made to a borrower other than Tidal. This was allegedly done to conceal the violation of the legal lending limit *and "to assist officers of Tidal in concealing a certain amount of its secured debt."* (*Slade, Odette* and *Feldman* Third-Party Complaints, paragraph 29; *Compass* Third-Party Complaint, paragraph 30) (Emphasis added).

In its *ad damnum* clause, Shearson claims only indemnification; but in its moving papers, it asks for contribution should its indemnification claim be denied.

**954**

*Indemnification Does Not Lie for the Violations with which Shearson is Charged; but Contribution is Allowable*

 I agree with NBNA's contention that the law of this court and circuit precludes Shearson from recovering indemnification for the violations of the securities laws alleged in the complaints. For plaintiffs to recover from Shearson *in the principal actions* for its alleged violations of Rule 10b–5, § 17(a) of the 1933 Act or § 15(c) of the 1934 Act, plaintiffs must establish that Shearson made false statements with actual knowledge of their falsity or reckless disregard for the truth. Such a showing would clearly preclude Shearson from recovering indemnification.[9] With respect to the plaintiffs' claim under § 12(2) of the Securities Act, I am convinced that it would be inconsistent with the policy of the federal securities laws to allow indemnification to Shearson.

Globus v. Law Research Service, Inc., 287 F.Supp. 188 (S.D.N.Y.1968), aff'd in part and rev'd in part, 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) *(Globus I)*, held that indemnification is prohibited where the defendant has violated the fraud provisions of the securities laws with actual knowledge of the falsity of its statements or recklesss disregard for the truth. In *Globus I*, plaintiffs alleged that an issuer of stock, its president and an underwriter, Blair & Co., had published an offering circular containing misleading statements, allegedly in violation of Sections 10(b) and 15(c) of the Exchange Act and Sections 12(2) and 17(a) of the Securities Act. The underwriter cross-claimed against the issuer and its president for indemnification pursuant to an indemnification agreement.

After a jury trial, the district court held that the underwriter could not recover indemnification from the issuer or its president since the underwriter had been found guilty of misconduct involving "actual knowledge" and "wanton indifference to its obligations." Indemnification in such circumstances would reduce the deterrent effect of the securities laws, and was therefore against public policy:

> "* * * [T]his Court believes that it would be against the public policy embodied in the federal securities legislation to permit Blair & Co., which has been found guilty of misconduct in violation of the public interest *involving actual knowledge of false and misleading statements or omissions and wanton indifference to its obligations* and the rights of others, to enforce its indemnification agreement." 287 F.Supp. at 199 (Emphasis added).

There had been a finding of actual knowledge in connection with the violation of § 12(2) as well as the other fraud sections. *In those circumstances,* the court prohibited indemnification with respect to that claim as well as the §§ 10(b) and 17(a) claims:

> "Since §§ 11 and 12(2) of the 1933 Act, 15 U.S.C. §§ 77k, 77l(2), require a diligent investigation by the underwriter, its motivation to conduct such an investigation, and to insure that

---

9. NBNA makes substantially the same argument, but phrases it in terms of "active" and "passive" violations of the securities laws. State Mutual Life Assurance Co. of America v. Peat, Marwick, Mitchell & Co., 49 F.R.D. 202 (S.D.N.Y.1969), did speak in terms of the state law distinction between "active" and "passive" tortfeasors, holding that "there is no implied right to indemnity if the defendant's tortious conduct is active." 49 F.R.D. at 212. It is settled, however, that indemnification for violations of the federal securities laws is a matter of feder-

al, not state law. Globus, Inc. v. Law Research Service, Inc., 318 F.Supp. 955, 958 n. 2 (S.D.N.Y.1970), aff'd, 442 F.2d 1346 (2d Cir.), cert. denied, Law Research Service, Inc. v. Blair & Co., 404 U.S. 941, 92 S.Ct. 286, 30 L.Ed.2d 254 (1971). Under federal law, the relevant fact is whether the defendant acted with actual knowledge of falsity or reckless disregard for the truth. In any event, "active" misconduct appears to be the semantic equivalent of fraud committed with actual knowledge or reckless disregard.

the circular will be truthful, should not be lessened by permitting enforcement of the indemnity agreement, at least under circumstances where he has been found guilty of misconduct evincing *actual knowledge or reckless disregard* of the falsity of the offering circular." [citations omitted] 287 F.Supp. at 199 (Emphasis added).

The Second Circuit, apparently without distinguishing the § 12(2) claim from the §§ 10(b) and 17(a) claims, affirmed the district court holding that indemnity was prohibited as against the policy of the securities laws where "there [was] actual knowledge of the misstatement by the underwriter and wanton indifference by Blair to its obligations. * * *" 418 F.2d at 1288.

 Subsequent cases in which the party seeking indemnification was found to have acted intentionally or with actual knowledge have also denied indemnification. Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, 378 F.Supp. 112, 135 (S.D.N.Y.1974); *see* State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., CCH Fed.Sec. L.Rep. ¶ 94,543 (S.D.N.Y.1972). I reject Shearson's contention that these decisions indicate that indemnification is allowable where reckless disregard is shown but where there is no showing of intent or actual knowledge.[10]

On this motion, it is somewhat difficult to apply the standards of *Globus I*, since here there has been no trial to determine whether Shearson *actually* made knowing misrepresentations or acted in reckless disregard of the truth. NBNA

suggests that in order for Shearson to be found guilty of *any* of the securities law violations alleged in the principal actions, there must be a finding of *scienter* which would disqualify Shearson from indemnification. If NBNA is correct, the third-party claim for indemnification should be dismissed since a finding of liability in the principal actions would necessarily disqualify Shearson from indemnification. Shearson is charged in the principal actions with violations of §§ 10(b) and 15(c) of the Exchange Act and §§ 12(2) and 17(a) of the Securities Act. Following NBNA's approach, our problem is to determine whether liability under each and every one of these provisions *necessarily* presupposes a finding of knowing misrepresentation or reckless disregard for the truth. If so, Shearson could not, under *Globus I*, be indemnified for liability under any of these provisions, and the claim for indemnification should be dismissed. *See* State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., *supra*.

 With respect to the claims against Shearson under § 10(b) and Rule 10b-5, the rule in this circuit is that liability requires proof of knowing misrepresentation or reckless disregard for the truth.[11] In Lanza v. Drexel & Co., 479 F.2d 1277, 1305 (2d Cir. 1973), the Court of Appeals defined the standard as follows:

"* * * [A] plaintiff claiming a violation of Rule 10b-5 who cannot prove that the defendant had *actual knowledge* of any misrepresentations

---

10. *See* Sherlee Land v. Commonwealth United Corp., CCH Fed.Sec.L.Rep. ¶ 93,749 (S. D.N.Y.1973) and Gould v. American Hawaiian Steamship Co., 387 F.Supp. 163 (D.Del. 1974), which are discussed in detail in connection with plaintiffs' claims under § 12(2).

11. Liability under Rule 10b-5 does not require proof of intent to defraud. Globus v. Law Research Services, Inc., *supra*, 418 F.2d at 1291. This view is not contradicted by Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971), which refers to "intent to defraud" in the disjunctive:

"[A 10b-5 claim requires] allegation of facts amounting to scienter, intent to defraud, reckless disregard for the truth or knowing use of a device, scheme or artifice to defraud."

A requirement of knowledge or reckless disregard is the sort of "watered-down" *scienter* requirement which Professor Loss believes is mandated by the statutory language of Section 10(b) and which must therefore be applied in actions under Rule 10b-5. 3 L. Loss, Securities Regulation (1961 ed.) at 1766; 6 Loss (1969 Supp.) at 3884.

and omissions must establish, in order to succeed in his action, that the defendant's failure to discover the misrepresentations and omissions amounted to a *willful, deliberate, or reckless disregard for the truth* that is the equivalent of knowledge." (Emphasis added)

*See* Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971); Matheson v. White Weld & Co., 53 F.R. D. 450, 452 (S.D.N.Y.1971).

■ The same showing of knowledge or reckless disregard is required in a private action under Section 17(a). Globus v. Law Research Service, Inc., *supra*, 418 F.2d at 1290–91; Weber v. C. M. P. Corp., 242 F.Supp. 321, 325 (S.D. N.Y.1965); *see* SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 n. 15 (2d Cir. 1972) (*dictum*); Fischman v. Raytheon Mfg. Co., 188 F.2d 783, 787 n. 2 (2d Cir. 1951) (*dictum*).

The standard of liability in a private action under § 15(c) is not free from doubt. In Matheson v. White Weld & Co., *supra*, Judge Gurfein stated that an allegation of "fraud" was required, implying that there must be a showing of *scienter*:

"[T]he Court notes as well that the required specification of fraud which would be required to make a Section 15 violation is missing." 53 F.R.D. at 453.

The position that a showing of *scienter* is required is supported by the language of § 15(c)(1), 15 U.S.C. § 78o(c)(1), which prohibits any "manipulative, *deceptive* or other *fraudulent* device or contrivance." [12] Emphasis added).

In summary, I conclude that for Shearson to be held liable under § 10(b), § 17(a) or § 15(c), there must be a showing of such knowledge of falsity or reckless disregard of the truth as would bar its claim for indemnity.

■ With respect to the § 12(2) claim, unlike the claims under the other three sections, in order for Shearson to be held liable, there need be no showing of knowing misrepresentation or reckless disregard of the truth. Section 12(2) imposes strict liability, subject to the reasonable-care defense. The resulting standard is one of negligence. Thiele v. Shields, 131 F.Supp. 416, 419 (S.D.N.Y.1955) (*dictum*); Johns Hopkins University v. Hutton, 297 F.Supp. 1165, 1219–20 (D.Md.1968), aff'd in part and rev'd in part, 422 F.2d 1124 (4th Cir. 1970).[13]

If Shearson were held liable under § 12(2) on a showing of mere negligence, *Globus I* might not necessarily preclude the court from awarding indemnification. The Second Circuit was careful to confine its holding barring indemnification to conduct involving "more than ordinary negligence." 418 F.2d at 1288. Nonetheless I believe that the court's statement of the public policy objections to indemnification of liabilities under the 1933 Act is broad enough to cover *negligent* misconduct in violation of § 12(2). This is particularly so where, as here, that liability may be imposed on a defendant wholly or in part for misconduct in its capacity as an underwriter. 418 F.2d at 1289.

Two recent district court decisions support the view that a defendant should be denied indemnification even where his conduct is merely negligent

12. Although the language of Rule 15c1–2 implies that negligence is sufficient, *see* 6 Loss at 3885, a Commission rule cannot dispense with a requirement of *scienter* if such requirement is imposed by the language of the statute under which the rule is promulgated. The language of § 15(c)(1), which is similar to that of § 10(b), 6 Loss at 3884, implies that § 15(c) requires proof of *scienter* com-

parable to that which must be shown under Rule 10b–5.

13. The *obiter dictum* in Barnes v. Osofsky, 373 F.2d 269, 272 (2d Cir. 1967), that § 12(2) retains "some form of the traditional *scienter* requirement" may be an imprecise reference to the negligence standard.

and does not involve actual knowledge or reckless disregard. Sherlee Land v. Commonwealth United Corp., CCH Fed. Sec.L.Rep. ¶ 93,749 (S.D.N.Y.1973); Gould v. American Hawaiian Steamship Co., 387 F.Supp. 163 (D.Del. Dec. 19, 1974). Both cases involved alleged violations of Rule 14a–9, the fraud provision of the proxy rules which, unlike Rule 10b–5, imposes a negligence standard. Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1304 (2d Cir. 1973).

In *Gould,* the court expressly determined that even where defendant was guilty of mere negligence, indemnification would be contrary to the deterrent policy of the securities laws: [14]

"\* \* \* § 14(a) reaches negligent as well as deliberately deceptive conduct, [citation omitted], and the considerations governing indemnity thereunder are, accordingly, somewhat different.

"It is well established that the purpose of § 14(a) is regulatory, not compensatory. \* \* \* Thus, the question of who pays the damages to the plaintiffs is of as great concern as the issue of whether the plaintiffs are to be compensated at all. (footnote omitted) To allow, indemnity to those who have breached responsibilities squarely placed upon them by the statute would vitiate the remedial purposes of § 14(a). (footnote omitted) Only a realistic possibility of liability for damages will encourage due diligence by those who solicit proxies and will protect the interest of informed corporate suffrage. \* \* \* " 387 F.Supp. at 167.

Indemnification must also be denied to encourage the reasonable care required by § 12(2).

In summary, I conclude that full indemnification should not be permitted for any liability sustained by Shearson under any of the provisions of the securities laws relied on by the plaintiffs in the principal actions.[15]

*Contribution*

Shearson's third-party claim should not be dismissed, however, for it may be able to make a valid claim for contribu-

14. It is unclear from the opinion in Sherlee Land Development v. Commonwealth United Corp., *supra,* whether the court expressly considered the significance of denying indemnification in a case involving mere negligence.

On this motion, I am not required to determine whether a defendant held liable *without fault* could recover indemnification. Thomas v. Duralite Co., 386 F.Supp. 698 (D.N.J.1974), where a corporation was allowed indemnification from its officers and directors for whose misconduct the corporation was held vicariously liable without fault.

15. Shearson's contention that the standard set for indemnification in securities cases is one of comparative fault must be rejected. In Globus I, the district court stated that "the jury concluded that as between the wrongdoers Blair & Co. was less guilty than the others and therefore should be able to collect over from them." 287 F.Supp. at 199. Nevertheless, the court barred indemnification since Blair had actual knowledge. The Court of Appeals affirmed, expressly rejecting a standard of comparative fault, at least with respect to underwriters' indemni-

fication claims against the issuer. 418 F.2d at 1288.

The cases cited by Shearson in support of its comparative fault standard are inapposite. Some involve indemnification for negligence in other fields, *e. g.,* Ingham v. Eastern Airlines, Inc., 373 F.2d 227, 240 (2d Cir. 1967); the Court of Appeals has warned expressly against relying on such cases in securities fraud cases. Globus v. Law Research Service, Inc., *supra,* 418 F.2d at 1289. Pearlstein v. Scudder & German, 429 F.2d 1136 (2d Cir. 1970), and Nathanson v. Weis, Voisin, Cannon, Inc., 325 F.Supp. 50 (S.D.N.Y.1971), speak in terms of comparative fault in holding that plaintiff *customers* were not barred by *in pari delicto* from recovery against their broker. But the express ground of those decisions was that public policy required that civil liability be imposed on broker-dealers to deter securities law violations. This policy would be ill-served by allowing a defendant *broker,* found guilty of securities law violations, to obtain full indemnity from a third-party defendant on a showing that the third-party defendant was more culpable.

tion if it can establish that NBNA is jointly liable with it.

■ It is of no consequence that Shearson's third-party *complaints* request only indemnification, and that the claim for contribution is made for the first time in Shearson's moving papers. State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., *supra*; Tucker v. Arthur Andersen & Co., CCH Fed.Sec.L.Rep. ¶ 94,544 (S.D.N.Y.1974).[16]

Globus, Inc. v. Law Research Service, Inc., 318 F.Supp. 955 (S.D.N.Y.1970), aff'd, 442 F.2d 1346 (2d Cir.), cert. denied, Law Research Service Inc. v. Blair & Co., 404 U.S. 941, 92 S.Ct. 286, 30 L. Ed.2d 254 (1971) (*Globus II*), held that an underwriter found guilty of a *knowing* violation of Rule 10b–5 nevertheless had a right to contribution against the issuer and its president who were found jointly liable with it. *Globus II* was a later opinion by Judge Frankel in the case in which *indemnification* was denied to the underwriter, Blair & Co. The court reasoned that since contribution was expressly allowed by the specific civil liability provisions of the securities laws, § 11 of the 1933 Act and §§ 9 and 18 of the 1934 Act, a right to contribution should be implied where a defendant was held liable in an implied action under Rule 10b–5. *See* deHaas v. Empire Petroleum Company, 286 F.Supp. 809, 815–16 (D.Colo.1968), aff'd in part and vac. in part, 435 F.2d 1223 (10th Cir. 1970); 3 Loss at 1739–40, n. 178.

In *Globus II*, the court said that the deterrent policy of the securities laws which required that an underwriter not be permitted to shift its entire liability to another through indemnification also mandated that tortfeasors other than the underwriter not be allowed to escape liability for any part of the damages.

"The prior decisions * * * denying Blair's claim to indemnity support Blair's position now. A central ground for the ruling on indemnity was the judgment that allowing such means of absolution would dilute the deterrent impact of the securities laws * * *. The shoe is now on the other foot. If not identical, the mode of escape sought by [the issuer and its president] is objectionable on substantially similar grounds. They may not effectively nullify their 'liability for compensatory damages' by leaving the whole of the burden to the more prompt and diligent party with which they have been cast in joint and several liability." 318 F.Supp. at 958.

The holding of *Globus II*, allowing contribution even where the defendant has actual knowledge of falsity, has been followed in several cases in this and other districts. State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., *supra*; Tucker v. Arthur Andersen & Co., *supra*; Herzfeld v. Laventhol, Krekstein, Horwath & Horwath, *supra*, 378 F.Supp. at 135; Liggett & Myers, Inc. v. Bloomfield, 380 F.Supp. 1044 (S. D.N.Y.1974).

Since Shearson may recover contribution for liability under Rule 10b–5, it may also obtain contribution for liabilities under §§ 15(c) and 17(a) which impose similar standards of liability. *A fortiori* it may seek contribution for liability for negligent misconduct under § 12(2).

■ Shearson may assert its claims for contribution in third-party actions under Rule 14(a). State Mutual Life Assurance Co. of America v. Arthur Andersen & Co., *supra*; Liggett & Myers, Inc. v. Bloomfield, *supra*; deHaas v. Empire Petroleum Company, *supra*, 286 F.Supp. at 815–16; Getter v. R. G. Dickinson & Co., 366 F.Supp. 559 (S.D.Iowa 1973); 3 Loss at 1739. It is immaterial that NBNA was not named in the plaintiffs' complaints as a joint tortfeasor and that Shearson does not seek contri-

---

16. Rule 54(c), F.R.Civ.P., requires the court to give Shearson the form of relief to which it is entitled even if such relief is not demanded in its pleadings. *See* Kahan v. Rosenstiel, 424 F. 161, 174 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed. 2d 290 (1970); 10 Wright and Miller, *supra*, § 2662.

bution by cross-claim as in *Globus II*. The cases cited above dispose of NBNA's argument that a third-party claim for contribution does not adequately allege a "claim over" as required by Rule 14(a).

*Shearson's Third-Party Complaints State a Claim under Rule 10b–5*

1. *Purchaser-Seller Requirement*

NBNA contends that Shearson lacks standing to bring its third-party actions since it fails to meet the purchaser-seller requirement established in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

In reply, Shearson claims that with respect to the *Slade, Odette* and *Feldman* actions, the requirement has been met since Shearson "sold" for its own account as principal or "purchased for" its customers as agent. Alternatively, with respect to all four actions, Shearson claims that if judgment is rendered against it, the securities transactions which form the basis of these actions will, in effect, be rescinded, and Shearson will become a "forced purchaser." Finally, Shearson argues that a third-party plaintiff under Rule 14(a) need not meet the requirement.

 I agree with Shearson's contention that as to the *Slade, Odette* and *Feldman* actions, Shearson satisfies the purchaser-seller requirement. The main complaints in these actions allege in substance that the classes consist of customers of Shearson who purchased Tidal stock from Shearson as principal or through Shearson as agent during some specified period. (*Odette* Complaint, paragraph 24; *Slade* Complaint, paragraphs 2(b), (c); *Feldman* Complaint, paragraph 3). Shearson must clearly be deemed a "seller" as to those transactions in which it sold as principal. In addition, there is authority in this circuit that a broker who purchases or sells as agent for his customer satisfies the purchaser-seller requirement. A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397, n. 3 (2d Cir. 1967) (broker who purchased for customers as agent was a "purchaser"). Thus Shearson was also a "purchaser" in all transactions in which it purchased for class members as agent.

 In the principal *Compass* action, it is alleged that Shearson sold notes and warrants to Compass as agent for Tidal and its subsidiary, Galaxy Steamship Co. (*Compass* Complaint, paragraph 17). In Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715 (S.D.N.Y.1968), one who acted as an agent in selling securities for his principal was found to be a seller.[17] Thus the allegations of paragraph 17 of the *Compass* Complaint appear adequately to allege that Shearson was a "seller" for purposes of the purchaser-seller requirement.[18]

2. *The Third-Party Complaints Meet the Requirements of Rule 9(b)*

Rule 9(b), F.R.Civ.P, requires that allegations of fraud be stated with particularity. In addition, "the general rule is that Rule 9(b) pleadings cannot be based on information and belief." Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972). In the instant case, the allegation as to NBNA's knowledge, the general allegations of conspiracy and aiding and abetting, and the specific allegations of wrongdoing are all based on information and belief.

 The general rule is, however, "relaxed as to matters peculiarly within the adverse parties' knowledge,

---

17. Because of my conclusion that Shearson meets the purchaser-seller requirement with respect to all four actions, it is unnecessary to consider Shearson's alternative contentions that it was a forced purchaser and that the purchaser-seller requirement is inapplicable to third-party actions.

18. I reach this conclusion on the basis of the pleadings, despite the fact that Shearson's memorandum inexplicably characterizes Shearson as a "non-participant" in the transactions alleged in Compass.

[but] the allegations must then be accompanied by a statement of the facts upon which the belief is founded." (footnote omitted). Segal v. Gordon, *supra*, 467 F.2d at 608. Here the information as to the knowledge and intent of NBNA officers and the details of the alleged bribery of NBNA officers and falsification of NBNA's books are matters peculiarly within the knowledge of NBNA. In addition, the most significant allegation in the third-party complaints seems to be supported by sufficient detail to justify relaxation of the general rule. The charge that NBNA falsified its books to conceal "a certain amount of Tidal's secured debt," is accompanied by a precise specification of the amount by which NBNA's loans exceeded the legal lending limit, presumably the amount that was concealed.

Beyond this, the allegations of bribery and falsification of NBNA's books and the making of loans secured by nonexistent charters are sufficiently detailed to apprise NBNA of the circumstances and nature of the alleged fraud so that NBNA may prepare its defense. Securities and Exchange Commission v. Management Dynamics, Inc., CCH Fed. Sec.L.Rep. ¶ 94,168 at 94,734 (S.D.N.Y.1973), aff'd in relevant part, 515 F.2d 801 (2d Cir. 1975).

### 3. *Shearson Alleges Actionable Aiding and Abetting*

In paragraph 14 of its third-party complaints, Shearson alleges that NBNA "conspired with" Tidal in giving false statements to Shearson, and "aided and abetted" Tidal. The courts of this circuit have adopted the definition of aiding and abetting which appears in Section 876 of the Restatement of Torts. Lanza v. Drexel & Co., *supra*, 479 F.2d at 1303; Fischer v. Kletz, 266 F.Supp.

180, 197 (S.D.N.Y.1967); *see* Landy v. Federal Deposit Insurance Corp., 486 F.2d 139, 162–63 (3d Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Brennan v. Midwestern United Life Insurance Co., 259 F.Supp. 673, 680 (N.D.Ind.1966), 286 F.Supp. 702 (N.D.Ind.1968), aff'd 417 F.2d 147 (7th Cir. 1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970).

Three elements must be alleged in order for the complaint to state a claim for aiding and abetting under § 876.[19]

(1) It must be alleged that the putative principal violated the law. This requirement is met by allegations that Tidal misrepresented its financial condition, including the amount of its long-term debt, to the public and to Shearson with the intention of raising the price of Tidal stock and assisting the sale of Tidal securities.

(2) There must be an allegation that the alleged aider and abettor knew or should have known that the violation was occurring. Brennan v. Midwestern United Life Insurance Co., *supra*. In the instant case, the third-party complaints adequately allege that NBNA knew of the misrepresentations by Tidal.

(3) There is greater doubt as to whether Shearson adequately alleges that NBNA gave "substantial assistance or encouragement" to Tidal. The most important allegation in this regard is the charge that NBNA falsified its books both to conceal the violation of the legal lending limit and *"to assist officers of Tidal in concealing a certain amount of its secured debt."* (*Compass* Third—Party Complaint, paragraph 30; *Slade, Odette, Feldman* Third—Party Complaints paragraph 29) (Emphasis

---

19. Section 876 provides in part:

"For harm resulting to a third person from the tortious conduct of another, a person is liable if he

\* \* \* \* \*

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself \* \* \*."

added). It seems likely that Tidal would not have misrepresented the amount of its long-term debt to Shearson and to investors but for the assurance given by NBNA that if Shearson or any investor inquired of Tidal's principal creditor as to the amount of Tidal's liabilities, the misrepresentation would not be discovered.

Brennan v. Midwestern United Life Insurance Co., *supra*, supports the view that the falsification of NBNA's books constituted "substantial assistance or encouragement." In *Brennan*, the court found that Midwestern, the issuer, had learned that Dobich, a broker dealing in the company's securities, was engaged in a scheme whereby delivery of customers' certificates was delayed, and customers' funds were used for speculation and other improper purposes. Midwestern threatened to and once did report Dobich to the Indiana Securities Commission. However, because Dobich's extensive trading increased the market price of Midwestern stock, Midwestern changed its policy. Instead of carrying out its threat to report Dobich, it wrote to complaining customers (with copies of the letter sent to Dobich), instructing them to refer their complaints first to Dobich himself, and then to the Indiana Securities Commission if they were not satisfied. The Court of Appeals agreed with the trial court that Midwestern's failure to report Dobich to the Indiana Securities Commission, *combined with* the affirmative action of referring complaining customers to Dobich, rather than the Commission, was "substantial assistance or encouragement."

"By referring directly to Dobich the complaints of dissatisfied customers who potentially could [have] filed charges before the Securities Commission, the possibility that the Securities Commission would interfere was substantially reduced. This *affirmative conduct on Midwestern's part* facilitated the commission of Dobich's fraud because it armed him with the knowledge that complaints to Midwestern would be referred to him first rather than to the State Commission." 417 F.2d at 154 (Emphasis added).

The court found that under these circumstances, the failure to report Dobich was "more than an omission:"

" \* \* \* [I]t was a signal to Dobich that further inquiries would not be handled as earlier threatened, and that Dobich would be given an opportunity to cover his non-deliveries." 417 F.2d at 154–55.

I think that the allegations here present an even stronger case of "substantial assistance or encouragement" than the findings in *Brennan*. In this case, Tidal was given assurances by NBNA that NBNA, like Midwestern, would take no action to report Tidal's misrepresentations. In addition, however, NBNA, unlike Midwestern, in substance offered assurances that it would *corroborate* Tidal's false statement of its liabilities by showing inquiring investors identical entries on its own books.

I acknowledge that Shearson would make a stronger showing of a causal connection between NBNA's alleged misrepresentations in its own books and the injury to Shearson or plaintiffs if it were alleged that Shearson had actually examined NBNA's books and had relied directly on the false figures therein. Nonetheless, this court's decision in Fischer v. Kletz, *supra*, supports the view that a party may give substantial assistance or encouragement even if it makes no direct misrepresentations to those who are ultimately deceived.

In *Fischer, supra*, the defendant accountant was retained by Yale Express to conduct "special studies" of the company's financial condition for use solely by the corporation. In the course of these studies, the accountant found that figures which had previously been pub-

lished and were then in use by the company were materially misleading. Nevertheless, the accountant allegedly recommended that the false figures be used in "interim statements" which were published by the company several months before the results of the special studies were released. There was no allegation that the defendant accountant participated in any way in the preparation of the misleading "interim statements," or that any of the false figures were attributable to it. Nevertheless, the court was not prepared to say on a motion to dismiss that the act of recommending use of the false statements did not constitute substantial assistance or encouragement. 266 F.Supp. at 197.

In the instant case, it is alleged not merely that NBNA recommended or concurred in Tidal's misstatements as in *Fischer*, but that NBNA falsified its own books "to assist" Tidal in concealing the alleged misrepresentation. This constitutes greater assistance or encouragement than the mere act of recommending publication of false financial statements which was alleged in *Fischer*.

NBNA contends that the decision of the Ninth Circuit in Wessel v. Buhler, 437 F.2d 279 (9th Cir. 1971), is to the contrary. In that case, the defendant Jordan, an independent certified public accountant, was retained on three occasions by a corporation to prepare financial statements which were never publicly disseminated. Some of the figures prepared by Jordan reappeared in a prospectus published by the company, but other unfavorable figures were either omitted or distorted. Finding no evidence that Jordan had participated in preparing the false prospectus, the court considered whether he might be held liable as an aider and abettor on the ground that some of the figures prepared by Jordan which were reproduced in the prospectus were themselves misleading. However, the court found no evidence that any of these figures were inaccurate. Nevertheless, the court suggested that even if the figures were misleading, Jordan might not be held liable:

> "[E]ven if some inference might arise that those figures were misleading, as we have said, there was no evidence at all to prove that Jordan was in any way responsible for their appearance in the third prospectus." 437 F.2d at 283.

*Wessel* is distinguishable on its facts. There the court expressly found no evidence that any of the figures prepared by the accountant which were used in the prospectus were misleading. Here, by contrast, it is alleged that the entries in NBNA's books which might have been used to corroborate Tidal's statement of its long-term debt were themselves false. The above-quoted statement from *Wessel* that even if the figures were false, Jordan might not be held liable, is *dictum*; moreover, as I concluded above, it is sufficiently alleged that NBNA is responsible for the appearance of the false figures published by Tidal.

NBNA also contends that Landy v. Federal Deposit Insurance Corp., *supra*, is contrary to the view taken here. In *Landy*, the shareholders of a bankrupt bank brought a class action alleging that the bank's accountant was liable, *inter alia*, for aiding and abetting the massive speculation by the bank's president with bank deposits and the misrepresentation of those transactions to bank shareholders. Plaintiffs admitted that the accountant had been retained to prepare statements for use solely by the bank's board of directors, and that none of the class members had had access thereto. They argued, however, that it was foreseeable that the figures in the accountant's reports, which were false in that they did not reflect the bank president's speculation, would be used in the preparation of statements that would be issued to the public. The Third Circuit held, however, that the claims against the accountant should be dismissed since there was no evidence either that he expected his figures to be used in public

financial statements or that they were in fact used.[20] 486 F.2d at 168–69.

The present case is distinguishable from *Landy*. Here it is alleged that NBNA falsified its books "to assist Tidal" in concealing the amount of its liability from Shearson and the public. There is no material difference between the conduct alleged here, the falsification of defendant's own books to corroborate a corporation's financial statements to the public, and an accountant's preparation of false figures for use in that corporation's statements to the public. For this reason, I am convinced that the element lacking in *Landy*— namely some use of the defendant's false figures in connection with statements to the public—is present in the instant case.[21]

█ In conclusion, I find that the third-party complaints state a claim for aiding and abetting.[22]

## Conclusion

The *Feldman* action is consolidated with the *Slade* and *Odette* actions. Venue is proper in the Southern District of New York, and Shearson is entitled to seek contribution from NBNA for any liability it may sustain in any of the four principal actions. In addition, Shearson has standing to bring its third-party actions, and its third-party complaints state a claim against NBNA. Accordingly, NBNA's motions to dismiss the third-party complaints are in all respects denied.

So ordered.

20. Applying the test set forth in SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968), cert. denied, Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the court found that the accountant's alleged fraud was not "in connection with the purchase or sale of any security" since the statement was not made "in a manner reasonably calculated to influence the investing public."

21. In Landy, unlike Wessel there was evidence that the accountant's figures were in-

accurate. But the other element necessary for liability—namely, some *use* of the accountant's figures in public statements—was lacking in *Landy*, although present in *Wessel*. In a sense, both elements concur in the present case.

22. The parties did not adequately brief the issue of whether the third-party complaints state a claim for conspiracy. Thus the court does not consider that issue.